### GENERAL ELECTRIC CO. v. PHILCO CORP.

United States District Court
S. D. New York.
June 19, 1951.

Charles H. Walker, New York City, Fish, Richardson & Neave, New York City (Henry J. Zafian, New York City, of counsel), for plaintiff.

Howson & Howson, Philadelphia, Pa. (Charles H. Howson, Jr., Philadelphia, Pa., of counsel), for George E. Curtiss, Jr.

LEIBELL, District Judge.

On October 22nd, 1948, plaintiff commenced this action under Rev.Stat. § 4915,

35 U.S.C.A. § 63, for an adjudication that plaintiff is entitled to receive a patent (upon application No. 570,870 of its employee and assignor, Hogg, filed January 1, 1945) for the invention of a door latch, particularly suitable for use on the door of a refrigerator although not limited to that use. In an interference proceeding the Patent Office, on June 3, 1948, awarded priority of invention to Curtiss. His applications (Nos. 507,839 and 515,570) were filed on October 27th and December 24th, 1943, respectively. Curtiss is the defendant's assignor. The patents to Curtiss (Nos. 2,-451,380 and 2,451,381) were issued October 12, 1948.

 After the decision of the Board of Interference Examiners, plaintiff could have appealed to the United States Court of Customs and Patent Appeals under Rev. Stat. § 4911, 35 U.S.C.A. § 59a, on the record made before the Patent Office. In the interference proceeding Curtiss offered no proof as to dates of discovery or reduction to practice. He relied on the dates of his two applications; October 27, 1943 for application No. 507,839 containing common claim 4, and December 24, 1943 for application No. 515,570 containing common claims 1, 2 and 3. The burden assumed by Hogg in this action is to prove that he conceived his invention prior to Curtiss' filing dates, and that he had disclosed it and that it had been reduced to practice prior to the Curtiss filing dates, with respect to their common claims. Plaintiff's counsel contend that on the proof before this court they have established that Hogg conceived, disclosed and reduced to practice the invention, as described in all four claims in suit, quite some time prior to the Curtiss filing dates.

The unique feature of this latch was described by plaintiff's counsel at the trial as follows:—"Now the unique thing about this particular latch is that instead of the user being required to supply the force necessary to close the door and compress the gasket as is the case in the conventional latch, this latch has energy stored up in a spring inside by the user at the time he opens the door so that the mechanism is what we might call cocked and put in a position, such that when the door is swung closed to a position where the keeper is just about to come into contact with what we might call the trigger of the latch, a very small pressure resulting from that contact causes the apparatus to virtually reach out and grasp the keeper and forcibly pull the door closed and compress the gasket."

Or, as Hogg put it in his affidavit of March 16th, 1950:—"The latch spring, rather than the person operating the door, served to apply the compressive force".

The opinion of the Board of Interference Examiners stated that the interference involved four counts of which count 4 was considered illustrative. The Board's opinion did not seriously question the fact that Hogg had conceived the invention in 1941 or that the invention had been subjected to slam tests by General Electric at dates prior to Curtiss' filing dates.

The Board decided against Hogg principally because it was not shown, in the proof before the Board, that in the slam tests a satisfactory compression of the sealing gasket had been obtained. Curtiss submitted no proof to the Board. He contended that "the life test did not show that a proper seal was obtained at the compression gasket on the door". He also argued that the tests should have been made under actual refrigerating conditions, but the Board expressed no opinion as to that contention. At the trial of this action the plaintiff has more than filled the gap in the proof before the Board, and the defendant submitted no proof in opposition.

The parties disclosed to this court that prior to the trial they had entered into an agreement that whichever side was successful the other was to receive a non-exclusive license of the invention without cost. A copy of the complaint was served on the Commissioner of Patents. He did not appear or oppose. This is a trial de novo. The record before the Board was introduced to show what was before the Board. But the proof here includes many

affidavits and documents[1] not before the Board, which clearly and convincingly establish the facts which are set forth in the following findings of fact.

### Findings of Fact

1. The plaintiff, General Electric Company, is a New York corporation having its principal office and place of business in Schenectady, New York.

2. The defendant, Philco Corporation, is a Pennsylvania corporation authorized and licensed to do business in the State of New York and having a regular and established place of business in the Borough of Manhattan, New York City.

3. On January 1, 1945, Francis M. Hogg filed in the United States Patent Office a patent application for "Door Latching Mechanism," which application received the serial number 570,870.

4. Legal title to the Hogg application is in plaintiff as assignee.

5. On October 27, 1943, George E. Curtiss, Jr. filed in the United States Patent Office a patent application for "Latch," which application received the serial number 507,839.

6. On December 24, 1943, George E. Curtiss, Jr. filed in the United States Patent Office a patent application for "Refrigerator Door Latch", which application received the serial number 515,570.

7. Legal title to the Curtiss applications was in defendant as assignee.

8. On October 12, 1948, Curtiss patent 2,451,380 issued on Curtiss application 507,839 to defendant as assignee.

9. On October 12, 1948 Curtiss patent 2,451,381 issued on Curtiss application 515,570 to defendant as assignee.

10. Legal title to the Curtiss patents is in defendant.

11. An interference, number 82,547, was declared by the Patent Office with respect to the following four claims common to the Hogg application and to the Curtiss applications (claims 1–3 in Curtiss application 515,570, and claim 4 in Curtiss application 507,839):

"1. A latching mechanism comprising a movable latching member adapted to engage a keeper, a support, a toggle joint having a first link pivotally mounted on said support and provided with an ear portion and a second link operatively associated with said member, said toggle being movable to extended and retracted positions to move said member into and out of latching position with said keeper respectively, spring means operable to effect actuation of said toggle to its extended position, and manual means for effecting actuation of said toggle to its retracted position, said manual means including a pivotally mounted handle and a connecting rod having one end thereof pivotally connected to said ear portion of said first link and its other end pivotally attached to said handle so that rotation of said handle operates to rotate said first link about its axis and move said toggle to said retracted position.

"2. A door latch comprising a supporting structure, a latch bolt pivotally mounted on said structure, a toggle comprising a first link pivoted on said structure and a second link pivoted on said first link and on said bolt eccentrically of the pivotal axis of said bolt, a spring mounted on said structure laterally of said toggle and arranged to exert pressure on the pivotal connection between said first and second links, said spring being arranged for movement overcenter with respect to the pivot of said first link on said structure to force said toggle into its locked and broken positions, said toggle in its broken position holding said bolt in its retracted position and said toggle in its locked position locking said bolt in its latching position, the force of said spring being multiplied during movement of said toggle toward its locked position, manually operable means for moving said spring overcenter to unlock said toggle, and tripping means for moving said spring overcenter to lock said toggle.

---

1. In the Patent Office depositions of 15 witnesses and 37 exhibits were introduced. In the present action the parties have stipulated to admit affidavits of 26 witnesses and 86 exhibits, assembled by plaintiff.

"3. A door latch comprising a supporting structure; a latch bolt pivotally mounted on said structure, a toggle comprising a first link pivoted on said structure and a second link pivoted on said first link and on said bolt eccentrically of the pivotal axis of said bolt, a spring mounted on said structure laterally of said toggle and arranged to exert pressure on the pivotal connection between said first and second links, said spring being arranged for movement overcenter with respect to the pivot of said first link on said structure to force said toggle into its locked and broken positions, said toggle in its broken position holding said bolt in its retracted position and said toggle in its locked position locking said bolt in its latching position, the force of said spring being multiplied during movement of said toggle toward its locked position, manually operable means including a handle and a lost motion connection between said handle and said first link for moving said toggle out of its locked position and for moving said spring overcenter whereby said toggle is driven to its broken position, and tripping means for moving said toggle out of its unlocked position and overcenter to rotate said bolt and move it into latching position.

"4. In a door latch, a bolt movable in a plane substantially normal to the door axis and adapted to engage a keeper having a bolt-retaining surface substantially parallel to said axis, a toggle associated with said bolt and arranged to operate by expansion to advance the bolt into interlocking engagement with said keeper with increasingly amplified force as the toggle approaches the fully expanded position, resilient means operatively connected with said toggle for urging the toggle into the expanded position, and means for retracting the toggle against the action of said resilient means to disengage the bolt from the keeper, said bolt, toggle and keeper being constructed and relatively arranged so that the bolt when advanced into said engagement will meet the said retaining surface of the keeper substantially before the bolt has moved into the fully advanced position whereby the said resilient means may be effective through the expanding

toggle to draw the door securely to a tightly closed position."

12. Following the declaration of interference, proceedings were duly had, in accordance with the Rules of Practice of the Patent Office, in which evidence was offered on behalf of Hogg, the junior party, but in which no evidence was offered on behalf of Curtiss, the senior party, who relied on his earlier filing dates as establishing a constructive reduction to practice of the invention.

13. On June 30, 1948, the Patent Office board of interference examiners awarded priority of the invention as defined by all four claims to Curtiss, holding that Hogg's evidence, while sufficient to establish his conception of the invention prior to the filing dates of Curtiss, was inadequate to prove either of the two alternative additional legal requirements of a reduction to practice of the invention by Hogg prior to the Curtiss dates, or reasonable diligence by Hogg during the period between the Curtiss and Hogg filing dates. The board held that tests conducted by Hogg in 1941 failed to establish a reduction to practice of the invention because there was no evidence that during these tests the latch, intended for use on a refrigerator, in fact compressed the sealing gasket of the refrigerator.

14. Following the decision of the board of interference examiners, plaintiff in due course filed this action under Rev.Stat. § 4915, 35 U.S.C.A. § 63, in place of the alternative remedy of an appeal to the United States Court of Customs and Patent Appeals.

15. Defendant relies here, as in the Patent Office, on the Curtiss filing dates, which establish for Curtiss constructive reductions to practice in October and December, 1943. Plaintiff has presented substantial new evidence which was not before the Patent Office and which aids in establishing for Hogg both conception and actual reduction to practice of the invention substantially prior to the Curtiss filing dates. Plaintiff's new evidence meets all points as to which Hogg's testimony in the Patent Office was thought

by the board of interference examiners to be deficient.

16. Hogg's conception occurred in 1941, being evidenced by two drawings, each of which discloses the subject matter of each of the four claims in suit. The first of these drawings was made, signed and dated by Hogg on August 26, 1941 and on the same day shown to King, Hogg's superior, who also signed his name and the date. The second drawing was made, signed and dated by Hogg on September 10, 1941 and used by DuVze, a model maker employed by plaintiff, to construct, prior to October 6, 1941, a sample latch. Hogg's conception was therefore clearly prior to the 1943 dates relied upon by defendant.

17. Hogg has established several reductions to practice of the invention as defined by all four claims in suit prior to the Curtiss dates. Before making the latch above referred to from the drawing of September 10, 1941, DuVze had made a sample latch in accordance with Hogg's drawing of August 26, 1941. Prior to September 19, 1941, this first sample latch was mounted in the door of a refrigerator cabinet and was tested by Hogg and others, each of whom found that the latch not only operated successfully when the door was opened and closed, but also served to compress the standard rubber gasket carried by the door, thus providing a tight seal.

The first sample latch, as so mounted, was tested for wearing qualities by an automatic mechanism which continuously opened and slammed shut the door of the refrigerator cabinet. This so-called "slam" test ran from September 19, 1941 to October 6, 1941, and ended at 312,404 slams, at which time the latch was still performing satisfactorily. During this test, Hogg and others occasionally (while the automatic mechanism was stopped) examined the latch operation and its effectiveness in providing a tight gasket seal, each time finding both to be satisfactory.

In the fall of 1941, Knight, Chief Engineer of plaintiff's Refrigerator Cabinet Engineering Division, was shown the first sample latch mounted in a refrigerator. He opened and shut the door several times, noted the successful latch operation and the tight gasket seal it provided, and approved the latch for manufacture. At the time Knight had authority to give final engineering approval to all refrigerator components. Since 1947, several million refrigerators having latches in all substantial respects the same as this sample latch have been sold by plaintiff.

The second sample latch built by DuVze in accordance with Hogg's drawing of September 10, 1941, was tested by Hogg and DuVze, each of whom found its operation to be satisfactory.

The second sample latch was mounted in a new model refrigerator in the spring of 1943 and was tested by Hogg and others, each of whom found the latch operation and the tight gasket seal it provided to be satisfactory. This model refrigerator was tested during July and August 1943 under refrigerated conditions. The operation of the latch and the tight gasket seal it provided were satisfactory throughout these tests.

There were four subsequent tests of refrigerator cabinets using a sample Hogg latch which performed satisfactorily and provided a tight gasket seal. Three of these tests began prior to Curtiss' October 27, 1943 filing date, the fourth test prior to Curtiss' December 24, 1943 filing date.

18. Hogg having conceived and reduced to practice the invention as defined by each of the four claims in suit prior to the earliest dates asserted for his rival, Curtiss, has an effective date of invention prior to that of Curtiss.

The facts as found warrant the following conclusions of law:—

## Conclusions of Law

I. The Court has jurisdiction over the action and over the parties.

II. Plaintiff has established by new evidence, which in character and amount carries thorough conviction, that Curtiss is not entitled to priority of invention awarded him by the Patent Office.

III. Hogg is the first inventor of the invention as defined by the four claims in suit.

IV. Plaintiff is entitled, according to law, to receive a patent upon the Hogg application for the invention as defined by the four claims in suit.

* * * * * *

The Board stated in passing, as to count 3, that Hogg's August 26, 1941 drawing (Ex. 1) did not show "the lost motion connection of count 3". But another drawing (Ex. 17) dated September 10, 1941 does. The function of the push pin was also explained in Exhibit 7, a letter of October 13, 1941. Plaintiff's proof cleared up the Board's misconception of the function of the push pin in relation to the "lost motion connection" of claim 3. As expressed in plaintiff's brief:—"The push pin of plaintiff's Exhibit 1, when moved by the handle against the first toggle link, serves as a 'connection' between the handle and the link—thus satisfying the last requisite of claim 3's 'lost motion connection'." The court may draw its own inference from the evidence with respect to the "lost motion connection" of claim 3.

The affidavits in relation to the slamming tests and the examination of the gasket seal during those tests, using a "0.002" metal "feeler" gauge which is thinner than a sheet of ordinary bond paper, show that the experienced engineers did just what they would be expected to do, not only test the latch to see that it caught and held the door and would have a long life, but to see also that the latch sealed the door against the gasket, since it was to be attached to a "flush-type" door of a refrigerator. It was not to be used by plaintiff as the door handle of a taxicab, although it might be used for that purpose. Plaintiff was developing it as a door handle of a refrigerator and very naturally would be concerned with the ability of the latch to compress the gasket against which the door would close, so as to seal it tight. The device was shown and its operation demonstrated

to witnesses (Hogg, DuVze, King, Boddy and Eagles), as providing both "ease of door closure and a tight sealing of the gasket on the refrigerator cabinet". The additional proof at the trial showed that the gasket was well sealed by the pressure from the latch on the door. That proof was not before the Patent Office. This proof shows that Hogg reduced the invention to practice in September 1941. Proof as to later slamming tests, but prior to the earliest Curtiss' filing date, October 27, 1943, was also submitted to the court.

The slam tests between September 19 and October 6, 1941 were quite extensive. At the end of 141,627 slams the latch spring broke and had to be replaced. After that the slam tests were continued until a total of 312,404 slams had been registered. At times the slamming operation was stopped and the gasket seal was tested and the latch was examined.[2] Those slam tests showed that the latch itself would wear well in a long period of use and also that the gasket would be satisfactorily sealed by the compressing action of the lock.

It was not necessary that the refrigerator actually be in a state of refrigeration at the time of the test. In Myers v. Roethel, 90 F.2d 122 at page 124, 24 C.C.P.A., Patents, 1213, it was held there was a sufficient reduction to practice of a device for lifting automobile windows, on proof that the device was tested by installing it in an automobile door which was put into a machine which turned the window up and down 6000 times, without proof that the device was actually tested in an automobile door on the road. It has also been held that an electric lighter, which would be used on the dashboard of an automobile, could be properly tested as to operability when attached to a board in a laboratory, without being built into an automobile. See Sinko Tool & Mfg. Co. v. Automatic Devices Corp., 2 Cir., 157 F.2d 974 and cases cited in footnote on page 977. In the Sinko case Judge Learned Hand held that "a test under

2. Exhibit 6, the report on the slam tests is dated October 6, 1941.

service conditions is necessary in those cases, and in those only, in which persons qualified in the art would require such a test before, they were willing to manufacture and sell the invention, as it stands". 157 F.2d 974 at page 977.

Plaintiff's engineer, Knight, gave the manufacturing approval for plaintiff's latch in the Fall of 1941. However, World War II (December 1941) required plaintiff to devote its plants to wartime production. Since 1947 plaintiff has sold several million refrigerators with the Hogg-type latch. These latches are substantially the same as the 1941 latch. Slight changes to facilitate quantity production have been made, but the changes were "merely to avoid those conditions always inherent in original models", as Judge Hand noted in the Sinko case, supra.

Plaintiff was unable to produce the first sample latch constructed by plaintiff's engineer DuVze between September 9th and September 16th, 1941 from Hogg's drawing of August 26, 1941, but a second sample latch built by DuVze during the slam test and prior to October 6, 1941 and according to Hogg's drawing, was produced.[3] In this second sample latch a pull lever instead of a push pin released the toggle, and it had arcuate slots in the slide plates to permit operation of the bolt if the door was closed with the latch in the uncocked position.

In the Spring of 1943 the second sample latch was tested on a new "flush-type" door of a refrigerator model B-11 (Y-2). At Mr. Hogg's request Mr. DuVze made a handle and escutcheon assembly to be used with the DuVze second sample latch on this new type refrigerator. This escutcheon assembly (Ex. 19) and the latch (Ex. 16) were checked by Mr. DuVze and Mr. Hogg and were tested as to the latch operation and the compression of the gasket seal on a Y-2 refrigerator.

In June 1943 Mr. Hogg discussed the matter of producing some sample latches with Mr. Parsons of the Stanley Works. They agreed that the arcuate slot rebound modification should be omitted as little needed in ordinary latch operation. A drawing of the handle assembly was sent to Mr. Parsons on August 7, 1943. In early September 1943 Mr. Hogg received the first sample latch which that company manufactured for him. Later that month he received the second.

During the early fall of 1943 Mr. Harbinson (plaintiff's refrigerator designer) asked Mr. Hogg to mount a sample of the latch with a handle assembly in the new ND-8 (Y-3) refrigerator. The first Stanley Works sample latch was used with the handle assembly of the second Stanley Works sample. The designer of the new refrigerator (Harbinson) an engineer in the refrigerator division (Eagles), and one of his test men (Te Winkle) witnessed the tests. The evidence as to those tests, which were made with the refrigerator under refrigeration, was not before the Board in the Patent Office. There were four such additional tests, using a sample Hogg latch; three began prior to October 27, 1943 and the fourth prior to December 24, 1943. In January 1946 the push-type latch was authorized for full production.

Neither in the inference proceedings nor in this action was any proof offered by Curtiss as to the dates when he conceived his invention, disclosed it and actually reduced it to practice. In the brief submitted to the Examiner on interferences his attorney stated: "In view of the fact that the junior party Hogg had not established a case, the senior party Curtiss was content to rely on his filing dates of October 27, 1943 and December 24, 1943 for conception and constructive reduction to practice". At page 8 of his brief before the interference examiner, the attorney for Curtiss summed up his contentions (which were in the main adopted by the Board of Interference Examiners) as follows:—"There is *no* evidence, however, that the refrigerator door

3. Drawing of September 10, 1941, which is Exhibit 17. The second sample latch, made by DuVze, is Exhibit 16.

714

even carried a sealing gasket, or, if it did, that the latch performed its designed purpose of providing greater compression of the gasket and a better sealing of the door against the leakage of cold air from within the cabinet. There is *no* evidence purporting to show that the 1941 latch was tested under actual service conditions with the cabinet refrigerated. Moreover, there is no indication that anyone ever examined the gasket (if there was one) to determine its condition or determined the extent of gasket compression, if any, or made a check of the degree of sealing obtained. This so-called test of the 1941 latch appears to have been nothing more than a mechanical testing of the structural properties of the latch mechanism, per se, without any regard to the ability of the latch to provide, under actual service conditions, the greater gasket compression and better door sealing functions for which it was designed."

This defect in the proof before the interference examiner has been completely remedied in the proof submitted at the trial.

Curtiss' attorney in his brief before the interference examiner also attacked certain other claimed defects in Hogg's proof, in particular the proof as to the samples of the latches tested and their relation to Hogg's drawing of August 26, 1941 and the claims of Hogg's patent application. But the opinion of the Board of Interference Examiners gave little consideration to those objections and they all have been met by additional proof submitted at the trial.

Indeed, the attorney for the defendant stated on the record that in his view the proof submitted at the trial "effectively plugged the holes which existed in the Patent Office record, and there is nothing in rebuttal that we (defendant) can say on behalf of Curtiss that would overcome that evidence". In describing what his attitude was towards the proof submitted to the Patent Office, he stated that he "did not take any testimony in Curtiss' behalf, because anything that Curtiss did was later than what Hogg did and the sole issue to be determined (in the Patent Office) was whether what Hogg did was a satisfactory reduction to practice"? That question must

be answered in the affirmative in view of the evidence offered at the trial.

The plaintiff may submit a proposed judgment, on notice, granting it the relief prayed for in the complaint.