45 C.C.P.A. (Patents).

**Romey A. GAISER, Appellant,**

v.

**Cyril S. LINDER, Appellee.**

**Patent Appeal No. 6314.**

United States Court of Customs and Patent Appeals.

March 21, 1958.

John A. Blair and Harness, Dickey & Pierce, Detroit, Mich. (C. Willard Hayes, Washington, D. C., of counsel), for appellant.

Oscar L. Spencer, Pittsburgh, Pa. (George R. Jones and Beale & Jones, Washington, D. C., of counsel), for appellee.

Before JOHNSON, Chief Judge, and O'CONNELL, WORLEY, and RICH, Judges.

WORLEY, Judge.

This is an appeal from the decision of the Board of Patent Interferences of the United States Patent Office awarding priority of invention of the subject matter to the senior party, Cyril S. Linder, appellee here. The interference involves patent No. 2,557,983, granted to Linder on June 26, 1951, on an application filed March 22, 1949, and on application of the junior party, Romey A. Gaiser, appellant here, filed May 25, 1950. Since Gaiser's application was copending with that of Linder he has the burden of proving his case by a preponderance of the evidence only and not beyond a reasonable doubt. St. Pierre v. Harvey, 233 F.2d 337, 43 C.C.P.A., Patents, 918.

The issue is defined in two counts of which the following is representative:

"2. An article of manufacture which comprises a transparent glass base having thereon a pair of laterally spaced electroconductive bus bars disposed in a nonparallel manner and an electroconductive transparent metal oxide coating which is less electroconductive than the bus bars, said coating being in electrical contact with the bus bars and having a surface resistivity which increases as the distance between the bus bars decreases, whereby the film resistance between the opposed sections of the bus bars is

substantially the same throughout their entire length."

The invention in issue is a refractory base member, specifically an airplane windshield, provided with a transparent electroconductive film through which electric current may be passed to heat the windshield and prevent icing. Current is supplied to the coating by means of bus bars located at opposite sides or ends of the windshield. As recited in the counts, the bus bars are nonparallel, so that the coating between the bars varies in width and, in order to secure uniform heating, the coating is so formed that it has less surface resistivity where the bars are far apart than where they are close together. This result is accomplished by varying the thickness of the coating so that it is thickest where the bars are farthest apart and becomes gradually thinner as they approach each other.

The board found that Gaiser conceived the subject matter of the counts in January 1947, and was prior to Linder in that respect, but that he had established no date of reduction to practice prior to his filing date, May 25, 1950, and was lacking in diligence between September 1948 and February 28, 1949, and for substantial periods thereafter to Gaiser's filing date, May 25, 1950.

The conception date accorded Gaiser is properly established by his evidence and does not appear to be controverted here by Linder. On the other hand, there is clearly no evidence which could support a holding that Gaiser was continuously exercising reasonable diligence over the period between Linder's filing date, March 22, 1949, and Gaiser's filing date, May 25, 1950, and it is not contended by Gaiser that his evidence establishes such diligence. In order to prevail, therefore, Gaiser must establish a reduction to practice prior to March 22, 1949.

Gaiser's claim to reduction to practice prior to his filing date is based upon two sets of tests of windshields, allegedly made in accordance with the counts, in the summer of 1948. One set of tests was made at the plant of Libby-Owens-Ford Company and the other at Boeing Airplane Company. Linder contends that the evidence as to such tests is insufficiently corroborated, but we find it unnecessary to consider that matter since, in our opinion, even if it be assumed that all the tests were made as alleged by Gaiser, they were not sufficient to establish reduction to practice.

The articles on which Gaiser relies for reduction to practice were designed for use in airplane windshields and it is not alleged that they were suitable for any other purpose. They were allegedly made and coated as required by the counts, and the tests to which they were subjected were directed primarily to determining whether there was a uniform heat distribution over the surface when current was applied. No flight tests were made and, in fact, there is no evidence that the articles tested were ever installed in airplanes. So far as appears, they were not subjected to deflection of pressure tests, nor to conditions of vibration or air flow simulating those encountered in actual use in airplanes.

It is urged by Gaiser that the only novel feature involved in this case is the use of a coating of varying resistivity to produce uniform temperatures and that the only tests necessary are those showing the temperature to be uniform. However, the purpose for which the articles tested were designed was not to give uniform temperatures in a laboratory, but under service conditions in an airplane. It is entirely possible that a coating which would operate satisfactorily under laboratory conditions might fail to do so under the varying conditions of sun, wind, precipitation, vibration, and pressure encountered in actual use. The fact that generally similar devices having coatings of uniform thickness were known in the art is not, in itself, sufficient to establish, without proper tests, that Gaiser's variable-thickness coating would stand up under service conditions and would continue to give uniform heating.

■ The general rule is well established that tests under actual working conditions are necessary to establish reduction to practice. Kruger v. Resnick, 197 F.2d 348, 39 C.C.P.A., Patents, 994, and cases there cited. The board was of the opinion that actual flight tests of the windshields were not necessary, apparently because it might be difficult in such tests to subject them to the extreme weather conditions which might sometimes be met within practice, and because "Laboratory testing also comprehends testing to failure which cannot be done without hazard in flight." Those reasons certainly suggest the desirability of adequate laboratory tests before flight tests, but they are not convincing that flight tests are not necessary. Unless laboratory tests accurately duplicate flight conditions, there is a definite possibility that some factor not present in the laboratory may cause failure in actual use.

■ However, assuming, without deciding, that the invention here is of such a nature that it could be reduced to practice without flight tests, we agree with the board that the minimum testing required would involve conditions simulating those of actual use. In Chandler v. Mock, 202 F.2d 755, 757, 40 C.C.P.A., Patents, 846, it was held that an aircraft carburetor could not be reduced to practice without tests "under conditions of use, real or simulated, for which it was intended to function; namely, flight conditions." Similar holdings were made in Balogh v. Crot, 176 F.2d 923, 37 C.C.P.A., Patents, 707, with respect to a fluid conducting joint which was intended to be used on airplanes, even though the interference could was not limited to such use, and in Burns v. Curtis, 172 F.2d 588, 36 C.C.P.A., Patents, 860, with respect to a pump assembly designed for use in an airplane but not limited to such use in the count. No sound reason appears for applying a different standard in the instant case.

Gaiser relies on certain specifications of the Boeing Company, adopted in January of 1949, as showing that "the only test required to establish a reduction to practice of the invention in issue is a test of heating uniformity." However, it does not appear sound to hold that the specifications of one company can be arbitrarily used to establish a criterion for reduction to practice. Moreover, the Boeing specifications in question call for a number of tests in addition to those relating to heating uniformity. It is further noted that although Gaiser argues that pressure tests are unnecessary, his own witness Ball, an engineer of the Boeing Company, testified as follows:

"XQ. According to your recollection was it the practice of Boeing Airplane Company to test for deflection and pressure tolerance of these lights that were intended for commercial use? A. Very definitely."

For the reasons given, we are of the opinion that if the device here can be reduced to practice without flight tests, it must at least be subjected, inter alia, to conditions of vibration, temperature, pressure, moisture, and air flow, simulating those encountered in actual flight, and its ability to produce uniform heating under such conditions for a reasonable time must be demonstrated.

As above indicated, it is not alleged that Gaiser tested the invention under actual flight conditions at any time prior to his filing date. The tests described by him and his assistant, McAuley, as having been carried out at Libby-Owens-Ford in the summer of 1948 appear to have consisted essentially, if not solely, in determining whether there was a uniform distribution of heat. As explained by McAuley, that was done by forming a layer of frost on the coated glass, applying current to the coating, and observing the manner in which the frost was dissipated. Clearly such a test does not meet the requirements for reduction to practice set forth above.

The tests principally relied on by Gaiser took place at the Boeing plant in Seattle in September 1948, and a report on such tests is in evidence. Assuming, without deciding, that it is sufficiently es-

tablished that the windshields referred to in the report conformed to the requirements of the counts; that the results of the tests were as set forth in the report; and that such results show a sufficient uniformity of heating under the conditions of the test, we agree with the board that those tests are still insufficient to establish reduction to practice.

The report bears the heading: "Subject: Report of Tests to Date on L.O.F. Electropane Windows," and concludes with the general observation that "Many of the visible irregularities around the edge may be of little consequence and will have to be evaluated after further testing." Those statements seem to clearly indicate that further testing was required, and hence, that the results were not entirely satisfactory. Moreover, there is nothing to indicate that the tests were run under conditions of vibration, temperature, moisture, etc., which even approximated those encountered in actual service. We, accordingly, agree with the board that neither the Boeing tests nor those at Libby-Owens-Ford were sufficient to establish a reduction to practice.

Gaiser's record contains testimony to the effect that shortly after the Boeing tests referred to above, Libby-Owens-Ford became an approved source of supply for windshields and made a number of them on order for Boeing in 1949. The mere fact that Boeing ordered such windshields would not be evidence that they had been reduced to practice, since they might well have been ordered for the purpose of further testing and, in fact, the first paper referring to such an order in 1949 states that the windshields "will be used for test purposes." Moreover, as noted by the board, there is no corroboration of Gaiser's testimony that some of the windshields referred to in the 1949 orders were so constructed as to conform to the requirements of the counts. The orders in question, therefore, afford no evidence that the 1948 Boeing tests amounted to a reduction to practice, and in view of the above-noted lack of corroboration of Gaiser's testimony, the work done on those orders cannot be con-

sidered as showing diligence with respect to the invention here in issue. Kendall v. Searles, 173 F.2d 986, 36 C.C.P.A., Patents, 1045.

We are in agreement with the board that Gaiser did not reduce the invention in issue to practice until a time subsequent to Linder's filing date, and was not reasonably diligent for a time just prior to that date until his application was filed. It follows that priority was properly awarded to Linder, even if he be restricted for all purposes to his filing date, and it is accordingly unnecessary to consider the evidence offered on his behalf.

The decision of the Board of Patent Interferences is affirmed.

Affirmed.