FARRAND OPTICAL CO., Inc., Plaintiff-
Appellant,

v.

The UNITED STATES of America,
Defendant-Appellant.

No. 403, Docket 27333.

United States Court of Appeals
Second Circuit.

Submitted May 21, 1963.

Decided Nov. 6, 1963.

Willis H. Taylor, Jr., and John T. Farley, of Pennie, Edmonds, Morton, Taylor & Adams, New York City, for plaintiff-appellant.

Robert M. Morgenthau, U. S. Atty., and David R. Hyde, David Klingsberg, Robert E. Kushner, Asst. U. S. Attys., Southern Dist. of New York, New York City, for defendant-appellant.

Before CLARK, WATERMAN and MOORE, Circuit Judges.

LEONARD P. MOORE, Circuit Judge.

Plaintiff seeks compensation under the Invention Secrecy Act of 1951, 35 U.S.C. § 183, for the disclosure and use of its invention by the Government. Plaintiff's right to bring this action in a United States District Court, rather than exclusively in the Court of Claims, originally upheld by Judge Ryan in the district court, but denied by a panel of this court, was eventually upheld by an equally divided court sitting *in banc*. Farrand Optical Co. v. United States, 2 Cir., 317 F.2d 885. The proceeding *in banc* was restricted to the jurisdictional issue, and thus the original panel must now review the merits.

The basis of the relief sought is claim 32 of the Tripp patent application, now claim 4 of patent No. 2,719,457, which describes a device used by airplane gunners and bombers for scanning the horizon and sighting their targets. The facts of this case are amply presented in Judge Ryan's two comprehensive opinions in this case. Farrand Optical Co. v. United States, D.C.S.D.N.Y., 175 F. Supp. 230; D.C., 197 F.Supp. 756. They need only be reviewed as they bear upon the questions now before us, namely, liability and damages.

*Liability*

The critical contract is a research and development contract, dated March 10, 1945, between Farrand and the Government (Air Force), in substance, calling for the fabrication of one experimental model of a hemisphere gunsight for the SB-45 airplane. Previous contracts had existed between Farrand and the Navy and Farrand and the Air Force relating to the manufacture of a Mark 33 gunsight. The Government argues that it was vested with title to the Tripp invention under these earlier contracts. The Government's position is not supported by the contracts and the facts and, therefore, is rejected.

The March 10, 1945 contract gave the Government a non-exclusive, irrevocable and royalty-free license to make or have made articles embodying discoveries or

inventions made or first reduced to practice "in the performance of this contract." The factual issue is clearly drawn. Farrand contends that the Tripp invention was reduced to practice prior to March 10, 1945 and, hence, was not covered by the contract. The Government argues that reduction to practice did not come about until long after March 10, 1945 and, hence, its license was within the specific terms of the contract. The initial questions are: (1) what was being reduced to practice, and (2) of what did the reduction, if any, consist.

There is no dispute that the basis of the relief sought is claim 4 of patent No. 2,719,457 (the Tripp patent). This claim is based primarily upon the use of a cylindrical lens in combination with prisms to enable the viewer to scan a hemisphere. As stated by the trial judge, "Tripp, finally, with the spark of inventive genius, suggested the use of a cylindrical lens in the objective system of a telescope which would have the effect of splitting the entrance pupil and causing it to lie in two focii, one in each of the prisms. This permitted the use of small prisms without requiring a reduction in size of the entrance pupil and the consequent reduction in angle of view. This is the invention in suit." 175 F.Supp. at 236. This, then, is the invention which had to be reduced to practice.

### The Brown Box Mock-Up

Farrand's claim to reduction to practice rests upon the construction prior to March 10, 1945, of a device which embodied the optical principles set forth in claim 4. It was housed in a brown box. By placing the box on a window sill with one end protruding beyond the building line, the observer was able to view an entire hemisphere from his position within the building. To this extent this mock-up, referred to by Farrand as "crude," demonstrated the optical principles of the Tripp invention. If anything were reduced to practice at this stage, it could only have been the basic prismatic device because obviously the

Air Force did not desire to order the manufacture of a series of brown boxes so that his fighter pilots could sit at window sills and scan hemispheres. The trial court recognized this limitation by finding that "the invention had no practical use other than on airplanes and for military purposes as a part in a gunsight or bombsight." 175 F.Supp. at 243. In the trial court's second opinion, the same conclusion was reached, the court saying, "It is not in dispute that the invention had no commercial or practical use other than as part of a gunsight or bombsight." 197 F.Supp. at 758. Actually, the mock-up was offered "only as a hemisphere sight, with special qualities as to a large field of vision * * * suitable for incorporation in a complete assembly which would comprise an entire fire control system." It was never intended by Farrand or the Air Force that "either the mock-up, or the invention represented, was in itself complete and ready for installation in the nose or side of an airplane as a fire or bombing control system." 175 F.Supp. at 243. "It was recognized by both plaintiff and defendant that the problem of incorporating the sight in a fire control system in a plane was not solved by the mock-up but they also found it probable that, by further development, it could be so incorporated." 175 F.Supp. at 244.

Upon such an appraisal and upon such hopes was the development contract awarded to Farrand in an effort to make practical use of Tripp's ingenious optical invention in a gunsight and/or bombsight. Although the trial court did say that "the mock-up presented in workable and useable form what the Government has called 'the real novelty of the device' that is, the invention stated in 'Claim 4,'" 175 F.Supp. at 245, the court in view of its many other findings to the contrary could not have meant that the device in the brown box in its then form could have been placed in a fighter or bomber plane and have been either "workable" or "useable."

The device had never been incorporated into a gunsight or a bombsight, had never

been tested in such a sight and had never been subjected to any of the actual conditions in or out of an airplane which it would have to meet in use. The trial court, however, held that the brown box mock-up constituted "reduction to practice" under the law. The court's theory was expressed as follows: "After it was inspected, examined and operated, the invention was found by these men skilled in the art to be a satisfactory answer and a solution to the problem the Air Force could not resolve. Nothing more is required to constitute reduction to practice, and more could not be asked for or expected of an inventor. There was nothing conjectural about being able to look through plaintiff's device and being able to scan a 180° hemisphere. What the Air Force was searching for had reached its point of consummation in plaintiff's device." 175 F.Supp. at 243. The court concluded that the mock-up performed "the functions claimed for it and in the manner claimed." 175 F.Supp. at 244. And so it did. In its brown box the optical arrangement invented by Tripp illustrated the optical principles covered by claim 4. But is this "reduction to practice"?

■ What constitutes "reduction to practice" has been the subject matter of many decisions. "The general rule is well established that tests under actual working conditions are necessary to establish reduction to practice." Kruger v. Resnick, 197 F.2d 348, 39 C.C.P.A. Patents, 994, and cases there cited. Gaiser v. Linder, 253 F.2d 433, 436 (C.C.P.A.1958).

A review of the relevant cases decided over the last fifteen years by appellate courts indicates the importance of the "reduction to practice" element. Gaiser v. Linder, supra, involved an airplane windshield provided with a transparent electroconductive film through which electric current would be passed to heat the windshield and prevent icing. The court rejected the contention that since the only tests necessary were those showing that the film would produce uniform temperatures, laboratory tests were sufficient, saying:

"[T]he purpose for which the articles tested were designed was not to give uniform temperatures in a laboratory, but under service conditions in an airplane. It is entirely possible that a coating which would operate satisfactorily under laboratory conditions might fail to do so under the varying conditions of sun, wind, precipitation, vibration, and pressure encountered in actual use." At 435 of 253 F.2d.

Radio Corp. of America v. International Stand. Elec. Corp., 232 F.2d 726 (3d Cir. 1956) involved a radar system. The court found that there had been no reduction to practice, saying:

"The claimed invention was talked about as something to use on ships and large airplanes. Despite the obvious differences in the conditions on top of an office building and that on a moving ship at sea or in an airplane there was no experimentation done in either place." At 731 of 232 F.2d.

Chandler v. Mock, 202 F.2d 755 (C.C.P.A. 1953) involved an aircraft carburetor embodying a new automatic unit for the control of air and fuel mixtures. In holding the device not reduced to practice, the court said:

"The board in reaching its conclusion properly proceeded in accordance with an established principle of patent law that tests of a complex mechanical device consisting of an aircraft carburetor must establish that the carburetor would satisfactorily operate under conditions of use, real or simulated, for which it was intended to function; namely, flight conditions * * *". At 757 of 202 F.2d.

* * *

"The practicability of the invention should have been established by timely tests which adequately embraced the essential conditions which the carburetor would be re-

quired to meet in actual service on an airplane." At 758 of 202 F.2d.

Balogh v. Crot, 176 F.2d 923 (C.C.P.A. 1949) involved a fluid conducting joint for use in the hydraulic brake on the landing gear of an airplane. The court found no reduction to practice and said:

"[P]roof of actual reduction to practice, which demonstrates successful operation under the actual conditions in which it was designed to work, is necessary * * *

"It is obvious that actual working conditions were not present in the making of appellant's tests." At 926 of 176 F.2d.

* * *

"It is conceivable that the sealing rings would function for a few minutes or a few movements, under laboratory temperatures and in the absence of vibration and yet fail if used for longer periods, after a greater number of movements, under the temperatures and vibration encountered when such a fitting is used in connection with an airplane."

Burns v. Curtis, 172 F.2d 588 (C.C.P.A. 1949) dealt with a liquid pump assembly designed for feeding fuel to an airplane engine. The court held that there had been no reduction to practice, saying:

"[T]he invention in issue could not be reduced to practice until it was demonstrated that it was satisfactory for use on airplanes at high altitudes." At 590 of 172 F.2d.

* * *

"It seems unlikely that the conditions encountered in the use of an airplane, as regards such matters as temperature, vibration, and pressure, could be duplicated in a laboratory." Ibid.

Powell v. Poupitch, 167 F.2d 514 (C.C. P.A.1948) involved metal fasteners especially designed for coupling airplane cowling sheets together. The court, finding that there had been no reduction to practice, said:

"It is, of course, the general rule that a reduction to practice can be effected only by tests in actual service, or under conditions simulating those of actual service * * * In the instant case it is quite clear, in view of the strains and vibrations to which parts of an airplane are subjected in use, that it would be impossible to determine whether or not a cowling sheet fastener would operate satisfactorily without making tests in actual service." At 516 of 167 F.2d.

"Since the device was not tested in the place where it was designed to be used, a reduction to practice cannot properly be accorded on the basis of speculation that there might have been some possible use for which its suitability might be obvious without actual tests." At 516 of 167 F.2d.

■ On the other hand, reduction to practice is not "an inexorable condition in all circumstances" but merely one factor to be considered in determining whether the invention "enriched the art." Sinko Tool & Mfg. Co. v. Automatic Devices Corp., 157 F.2d 974, 977 (2d Cir. 1946). Judge Learned Hand in Sinko stated the doctrine succinctly:

"[A] test under service conditions is necessary in those cases, and in those only, in which persons qualified in the art would require such a test before they were willing to manufacture and sell the invention, as it stands."

■ Furthermore, changes made to eliminate crudities do not postpone the date of reduction to practice. This articulation of the doctrine has been adopted in later cases, American Mach. & Foundry Co. v. Liggett & Myers Tobacco Co., 172 F.Supp. 12 (D.N.J. 1959); General Elec. Co. v. Philco Corp., 99 F.Supp. 707 (S.D.N.Y.1951), and amplified in others:

"With some products, it is clear that actual use may be necessary to show reduction to practice * * * With others, however, laboratory (or similar) tests may be sufficient * * * The governing considerations are

two: First, do the tests employed—in actual use or in the laboratory—show that the product will serve the purpose for which it is designed, and show this so conclusively that practical men will without more take the risk of putting it into immediate commercial production and use? Second, would the time, effort and expense of conducting actual field experiments be unjustified because of the small likelihood that they would yield substantially greater knowledge concerning the product's performance?" Larsen v. Marzall, 90 U.S.App.D.C. 200, 195 F.2d 200, 202 (1952).

\* \* \*

"We think it is clear that reduction to practice does not mean that whatever is being worked upon has to be in shape to be commercially marketable. On the other hand, it must be a demonstration that the invention's idea works, not that he has thought the matter out and devised something that ought to work and may work but actually something that will work to accomplish its intended purpose." Radio Corp. of America v. International Standard Elec. Corp., 232 F.2d 726, 730 (3d Cir. 1956).

。 \* \* \*

"[W]e do not believe that an actual reduction to practice necessarily requires the making of a commercially acceptable embodiment, \* \* \* if the testing of it shows that it will perform its intended function. The amount of testing necessary depends upon the facts of the particular case. \* \* \* [W]e believe the law to be that reduction to practice is proved when there is corroborated testimony that the device actually performed the function for which it was designed." Schnick v. Fenn, 277 F.2d 935, 939–940 (C.C.P.A.1960).

■ In the reduction to practice cases, particularly where the device was intended for airplane installation, the courts quite obviously were influenced by the lack of demonstration that the devices in question could perform their intended function when subjected to the peculiarities of actual flight conditions, such as vibration, temperature, pressure, moisture and air flow. But it does not follow that any invention which is to become a part of a device to be used in an airplane cannot be reduced to practice by means other than actual flight testing. The essential inquiry here is whether the advance in the art represented by the invention, the so-called "flash of genius," was embodied in a workable device that demonstrated that it could do what it was claimed to be capable of doing. The "tests under actual conditions" rule cannot be an absolute requirement. Its applicability must depend on the nature of the device, the circumstances of its intended use, and the state of the art. Resolution of the question must depend on the particular facts of each case.

In the present case, what represented an advance in the art was a device that would solve the optical problems of a broad vision gun and bomb sight. Tripp's invention, the use of a cylindrical lens in the telescope that permitted the use of small prisms without requiring a reduction in the size of the entrance pupil and a consequent reduction in angle of view, did this and his mock-up demonstrated that his concept provided the answer. This was the essence of the invention and, as the trial court said, it was "probable" that the problems remaining could be resolved by application of the existing art. Further, those eminent in the art considered the mock-up a significant advance and a satisfactory answer to the problem presented.

In the "airplane" cases, the inventions in question were designed primarily for use in airplanes and the advances in the art that they represented were their ability to overcome the peculiarities and rigors of flight. Here, problems of application to flight conditions remained, but the advance lay not in overcoming peculiar optical problems encountered in

flight; rather it was construction of a device that would, in effect, put the viewer's eye immediately outside the structure that he occupied.

■ This court has no desire to disregard or weaken the uniform body of law that has developed for generations in reduction to practice cases, particularly in the "airplane" cases (see the forceful criticism of Judge Ryan's decision by Nemerovski, in Reduction to Practice: The Farrand Optical Illusion, 43 J.Pat. Off. Soc'y 99 (1961)). However, Tripp's invention can be considered to have been sufficiently reduced to practice if the scope of that invention is limited to the components embodied in the mock-up, namely, to claim 4. In fact, the Government itself concedes that the mock-up embodies the claims of claim 4. With the invention thus defined to include only those components embodied in claim 4, Judge Ryan's findings as to the compass of the "invention area" must be reviewed.

*Invention Area*

■ The trial court has found, and this finding is not challenged on appeal, that the invention is a separable unit and that the components upon which compensation should be based are only those includable in the invention itself. See Waite v. United States, 69 Ct.Cl. 153 (1930). The Government contends that the trial court was in error in including the optical dome, the eyepiece, and the rearward half portion of the erectors in the invention area.

Relying on the basic concept of patent law that the claims measure the scope of the patent monopoly, the Government argues that these items should not have been included in the compensable base. Neither the mock-up nor claim 4 encompasses the optical dome nor the rearward half of the erectors. Claim 4 does not include an eyepiece. The optical dome and the rearward half of the erectors that were included in the finished product were developed in the performance of plaintiff's development contract.

In order to avoid the conclusion that the invention was not reduced to practice

before March 10, 1945, an award of compensation must be based on components included in claim 4 as reduced to practice in the only device illustrating the optical principles claimed, namely, the brown box mock-up. The three items described above were innovations or refinements necessary to adapt the Tripp invention to use in aircraft. They were developed under the development contract and paid for by the Government. Without the use of Government resources, the Tripp invention as embodied in the mock-up would probably never have attained any commercial value. There is no compelling reason to require the Government to compensate plaintiff for items, the development costs for which it has already borne. Accordingly, the case must be remanded for a recomputation of the percentage area of invention excluding these three items.

This result does substantial justice between the parties. The Tripp invention was a significant contribution in the optical field and to the war effort. To hold that the mock-up did not constitute a reduction to practice, although the matter is by no means free of doubt, would be harsh and hardly conducive to the encouragement of the use of inventive genius in our defense effort. On the other hand, important as was the part which the Tripp invention played in the gunsight and bombsight, it must be remembered that this record convincingly discloses that four years of work by Farrand under the development contract and by others were consumed in an endeavor to bring these sights to a stage at which they could be actually used for military purposes. The Government has expended large sums of money in the development necessary to adapt the Tripp invention to use in airplanes. It should not be required to pay twice, and compensation to plaintiff should not include any items other than in the limited area which plaintiff's invention encompassed.

*Spare Parts*

■ In allowing compensation for the spare parts which the Government pro-

cured from Eastman Kodak for use in gunsights and bombsights containing plaintiff's invention, but manufactured by Eastman Kodak, we think the district court erred. This ruling is required by the recent Supreme Court decision, Aro Mfg. Co. v. Convertible Top Replacement Co., 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961). There the patent covered convertible tops for automobiles, consisting of the top fabric, supporting framework and a mechanism for sealing the fabric against the automobile body. Defendant manufactured, sold, and installed fabric tops designed to fit and replace the tops of the patented combination. The Supreme Court rejected the plaintiff's contention that defendant's activity constituted infringement. Farrand concedes that under the Aro doctrine it is entitled to no royalties on any spare parts which Eastman Kodak supplied the Government for use in gunsights and bombsights which Farrand manufactured. It argues, however, that when spare parts from Eastman Kodak were used in gunsights and bombsights manufactured by Eastman Kodak, such parts themselves constituted an infringement for which it is entitled to royalties. But this line of argument ignores the fact that the effect of this action has been to make Farrand whole for the gunsights and bombsights containing its invention which were supplied to the Government by Eastman Kodak. Thus, the result of this lawsuit is to put Farrand in the position it would have occupied had it duly licensed Eastman Kodak. Consequently, the distinction it attempts to draw between parts used in manufactured reproductions of the invention which were "legitimately" acquired and those where acquisition constituted infringement must fall.

### The 2½% Allowance

As part of the judgment, the district court awarded the plaintiff a sum computed as 2½% yearly from the dates of the Government purchases of sights from Eastman Kodak, for "delay in payment." The court said that this sum was awarded " 'not as interest but as part of the entire just compensation.' " 197 F.Supp. at 773.

The traditional rule concerning interest on claims against the Government was stated succinctly by the Supreme Court in United States v. Alcea Band of Tillamooks, 341 U.S. 48, 49, 71 S.Ct. 552, 95 L.Ed. 738 (1951):

> "[I]nterest on claims against the United States cannot be recovered in the absence of an express provision to the contrary in the relevant statute or contract. * * * This rule precludes an award of interest even though a statute should direct an award of 'just compensation' for a particular taking. * * * The only exception arises when the taking entitles the claimant to just compensation under the Fifth Amendment. Only in such cases does the award of compensation include interest."

See, also, United States v. Thayer-West Point Hotel Co., 329 U.S. 585, 67 S.Ct. 398, 91 L.Ed. 521 (1947); Albrecht v. United States, 329 U.S. 599, 67 S.Ct. 606, 97 L.Ed. 532 (1947); United States v. New York Rayon Importing Co., 329 U.S. 654, 67 S.Ct. 601, 91 L.Ed. 577 (1947); United States v. Goltra, 312 U.S. 203, 61 S.Ct. 468 (1941); Boston Sand Co. v. United States, 278 U.S. 41, 49 S.Ct. 52, 73 L.Ed. 170 (1928); Seaboard Air Line Ry. v. United States, 261 U.S. 299, 43 S.Ct. 354, 67 L.Ed. 664 (1923); United States v. North Amer. Trans. & Trading Co., 253 U.S. 330, 40 S.Ct. 518, 64 L.Ed. 935 (1920); Tillson v. United States, 100 U.S. 43, 25 L.Ed. 543 (1879); Miami Tribe of Oklahoma v. United States, 281 F.2d 202 (Ct.Cl.1960); Gray v. Dukedom Bank, 216 F.2d 108 (6th Cir. 1954); Riverview Packing Co. v. Reconstruction Finance Corp., 207 F.2d 361 (3d Cir. 1953).

The stringency and pervasiveness of this rule has been noted by the Supreme Court on a number of occasions. In United States v. Thayer-West Point Hotel Co., supra, the Court of Claims had added 4% per annum from the date

of the taking as "additional allowance to make compensation a just one as of the date of payment." The Court reversed, saying that to override the historical rule "something more is necessary than an equivocal use of the term 'just compensation.'" There must be a provision "'expressly stipulating for the payment of interest'. That provision must be affirmative, clear-cut, unambiguous; and an unexpressed intention by the parties that the term 'just compensation' be construed to include interest is insufficient." 329 U.S. at 590, 67 S.Ct. at 400–401, 91 L.Ed. 521. In United States v. New York Rayon Importing Co., supra, the Court said: "[T]here can be no consent by implication or by use of ambiguous language. Nor can an intent on the part of the framers of a statute or contract to permit the recovery of interest suffice where the intent is not translated into affirmative statutory or contractual terms. The consent necessary to waive the traditional immunity must be express, and it must be strictly construed." 329 U.S. at 654, 67 S.Ct. at 601, 91 L.Ed. 532.

■ Thus, it seems beyond argument that the United States has not consented, in the manner necessary, to an award of interest in the present case. Under the implied license theory of the district court, we cannot impute such consent to the Government, and since we must consider this a suit for "just compensation" under section 183, the cases noted above foreclose our reading into that phrase a consent to an award of interest. The only rationale remaining under which the award of interest might be sustained is that such an award· is constitutionally mandated by the Fifth Amendment.

When the United States condemns and takes possession of property, the owner is constitutionally entitled to just compensation, which includes an amount that will make the award the equivalent of his having received the value of the property at the date of the taking. Seaboard Air Line Ry. v. United States, 261 U.S.

299, 43 S.Ct. 354, 67 L.Ed. 664 (1923); Shoshone Tribe of Indians v. United States, 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360 (1937); Phelps v. United States, 274 U.S. 341, 47 S.Ct. 611, 71 L.Ed. 1083 (1927). This rule has been applied by the Supreme Court in suits against the United States for the unlicensed use of a patented invention. Waite v. United States, 282 U.S. 508, 51 S.Ct. 227, 75 L.Ed. 494 (1931).

The reasoning of the Court in that case is made clear by its decision in Richmond Screw Anchor Co. v. United States, 275 U.S. 331, 48 S.Ct. 194, 72 L.Ed. 303 (1928), relied on by the Court in Waite. In Richmond, the assignee of a patent brought suit against the United States for infringement. A statute (section 3477 of Rev. Stats.) had been construed by the Court to forbid suits by an assignee for an unliquidated claim against the Government that had arisen prior to the assignment. A 1918 amendment to section 68 of Title 35 (U.S.C.) limited the holder of a patent to suits against the Government for patent infringement and relieved a contractor manufacturing the patented article for the Government of all liability. But for this later statute, plaintiff, as assignee of the patents, could have sued the contractor. If section 3477 were held applicable and the assignments thereby rendered void, the effect of the section 68 amendment would have been to deprive the assignee of his claims against both the Government and against the contractor. The Court held that section 3477 did not apply to the assignment of claims against the United States which were created by section 68.

In so holding, the Court found that the statute took from a private person his lawful claim against another private person. This result, without a corresponding assumption of liability by the United States, would have given rise to a serious question of constitutionality under the Fifth Amendment. To avoid the constitutional problem, the Court construed section 68 as providing for an assumption of liability by the Government. Con-

gress "intended to secure to the owner of the patent the exact equivalent of what it was taking away from him." 275 U.S. 345. The Government became an "indemnitor for its manufacturer or contractor." The wording of section 68, providing for "reasonable and entire compensation" was found to buttress this interpretation.

Section 68 was also before the Court in Waite and the reasoning of Richmond compelled the award of interest on the claim against the Government. If the owner of the patent could have sued the contractor, he would have been entitled to interest. Since the Government completely assumed the liability of the contractor, it assumed the liability to pay interest.

In addition to the reasoning of the Richmond case, the Court had recognized that the unauthorized use of a patent by the Government was not tortious but that such use was a taking made lawful by section 68 which provided the procedure whereby the owner was to be compensated. Crozier v. Fried. Krupp, 224 U.S. 290, 32 S.Ct. 488, 56 L.Ed. 771 (1912); Irving Air Chute Co. v. United States, 93 F.Supp. 633 (Ct.Cl.1950). Thus, no matter how viewed, the section 68 (now 28 U.S.C. § 1498) patent infringement cases are eminent domain cases and fall within the exception to the general rule discussed above.

The present action is not based on a taking in the eminent domain sense. The District Court specifically held that "this is not a patent suit for infringement. * * * The claims here asserted are for compensation for use and disclosure." 175 F.Supp. at 233. The findings of the district court make clear that Farrand consented to Eastman Kodak's production of the sight. There was no exercise of the sovereign power of the United States to appropriate the Tripp invention, but rather an agreed upon use from which an implied promise to pay arose. United States v. Bethlehem Steel Co., 258 U.S. 321, 42 S.Ct. 334, 66 L.Ed. 639 (1922). "Plaintiff's claim here is for payment of just compensation for lawful use, not for compensation for unauthorized use, as for a tort." 175 F. Supp. at 247. In this situation, as where the Government expressly agrees to pay a fixed royalty rate, no interest can be assessed on the recovery. The fact that the Government had the power, if no agreement were reached, to exercise its power of eminent domain to take the invention does not convert the arrangement into a Fifth Amendment taking. United States v. North Amer. Trading Co., supra. If it did, of course, the Government would be liable for interest on a great number of contract claims. The rule is precisely the opposite. See discussion in United States v. North Amer. Trading Co., supra.

Although the District Court said that the additional 2½% computed yearly from the dates of purchases was for "delay in payment" and "not as interest but as a part of the entire just compensation," the result is tantamount to interest. Just compensation is achieved by applying the trial court's percentage ratio to the purchase prices. There is no provision in the statute for making "just" compensation more just by adding thereto an exact amount either ·as a bonus, as interest, or for delay in payment. This item must, therefore, be deleted from any award.

In its appeal plaintiff argues that it is entitled to compensation at a royalty rate of five percent and claims error in the district court's failure to award such compensation. The royalty rates used in other cases cited by plaintiff were based upon the facts of those specific cases. They are not controlling here.

We find no error in the rate of royalty allowed by the trial judge.

Judgment modified and case remanded for proceedings not inconsistent with this opinion.

WATERMAN, Circuit Judge (concurring).

I concur, but with the reservation I expressed in my dissent, reported at 317

F.2d 885 at 886, that the issues the panel here presumes to decide should have been determined by the court sitting *in banc* and should not have been adjudicated by this panel.