**FARRAND OPTICAL CO., Inc., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

United States District Court
S. D. New York.
Aug. 21, 1961.

Pennie, Edmonds, Morton, Barrows & Taylor, New York City, for plaintiff (Willis H. Taylor, Jr., New York City, of counsel).

Robert M. Morgenthau, U. S. Atty. for the Southern Dist. of New York, New York City, for defendant (Mark I. Cohen, Asst. U. S. Atty., New York City, of counsel).

RYAN, Chief Judge.

We have previously concluded by our decision of July 23, 1959 (D.C., 175 F.Supp. 230) that the plaintiff may lawfully claim any compensation which it may be entitled to recover under Title 35 U.S.C. § 183 and Title 22 U.S.C. § 1758. The trial of the second phase of this suit, which concerns the fixation of the amount of such compensation, has been delayed by discovery proceedings and accounting studies by the parties.

Plaintiff has waived all claim for compensation under the Mutual Security Act of 1954 (Title 22 U.S.C. § 1758). There remains for determination only plaintiff's claim under the Invention Secrecy Act (Title 35 U.S.C. § 183) for just compensation for the damage and/or use of the invention in suit. The claim is further limited by the fact that plaintiff by contract was obligated not to disclose this invention during the period in which the order of secrecy was effective and that plaintiff could not during this period publish the patent. Our problem then is to find and ascertain the amount of compensation, if any, plaintiff may recover only for the use of the subject invention.

The patent on this invention, No. 2,-719,457 (called in this litigation the Tripp patent) issued on October 4, 1955. However, the Government held a royalty—free license for "the duration of hostilities * * * plus six months". It has been stipulated "that plaintiff is in no event entitled to compensation prior to March 2, 1946 (which is six months subsequent to cessation of hostilities on September 2, 1945)". We then have March 2, 1946 as the starting date of any claim for compensation for use of the invention. Breese Burners, Inc. v. United States, 1954, 128 Ct.Cl. 649, 121 F.Supp. 530, 128 Ct.Cl. 649.

The area of use for which plaintiff may in any event recover is further confined by stipulation of the parties that there is no right, in plaintiff, to compensation in respect of any apparatus supplied by plaintiff to the Government, and that recovery shall be restricted to use by the

Government in the performance of certain specified contracts made by the Government with Eastman Kodak Company for sights which embodied and employed the invention.

At the outset, we are now met with the contention of the Government that this Court does not have jurisdiction under Title 35 U.S.C. § 183 to grant compensation for any use of the invention by the Government for the period after October 4, 1955, the date of the issuance of the patent. The Government urges that all evidence of use after that date be rejected and the recovery of plaintiff, if any, be so limited. It is the position of the Government that the sole forum available to plaintiff for its claim covering this period is in the Court of Claims.

Under the provisions of the statute (Title 35 U.S.C. § 183), the plaintiff had available to it three separate times when it could have attempted to have fixed and enforced payment of compensation claimed by it to be due from the Government for the use of its invention. Halpern v. United States, 2 Cir., 1958, 258 F.2d 36; Robinson v. United States, 2 Cir., 1956, 236 F.2d 24. Plaintiff commenced this suit on May 5, 1955, prior to the issuance of its patent on October 4, 1955; however, it could have awaited the issuance of the patent or have further delayed the

filing of its suit for six years after a patent issued.

■ From an independent examination of the legislative history of the Invention Secrecy Act of 1951 (35 U.S.C. §§ 181, 183, 66 Stat. 805, 806, July 19, 1952), and upon consideration of the precedents interpreting this Act,[1] we conclude this Court has jurisdiction to award compensation after the date of the granting of the patent, October 5, 1955, under Title 35 U.S.C. § 183 and to determine and award just compensation for use by the Government for the period commencing March 2, 1946 (when the Government's royalty free license terminated) to the date of the trial.

■ It is not in dispute that the invention had no commercial or practical use other than as part of a gunsight or a bombsight,[2] and the plaintiff does not contend that all of the claims of the patent as issued were used by the Government. Plaintiff seeks to recover compensation for the use of but one of the 22 claims allowed in the patent, that is, for application Claim No. 32, allowed December 21, 1942, which is now Claim No. 4 of the patent in suit No. 2,719,457.

■ ■ In determining the compensation for an invention which gives value to an entire apparatus, the component parts

1. The Court of Appeals for the Second Circuit carefully examined the legislative history and prior provisions for compensation that preceded the Invention Secrecy Act of 1951 (35 U.S.C. §§ 181, 183, 66 Stat. 805, 806, July 19, 1952; formerly 35 U.S.C. §§ 151–159, 66 Stat. 4, Feb. 1, 1952; previous legislation on this subject matter were: the Act of July 1, 1940, 54 Stat. 710, which was preceded by the Act of October 6, 1917, 40 Stat. 394) and determined that the District Courts had jurisdiction in the situations specified to alleviate some of the inconvenience in pressing suits in the Court of Claims and to assure that a claimant's rights were fully protected in those instances where the Court of Claims lacked jurisdiction under the statute as drafted. Halpern v. United States, supra; Robinson v. United States, supra. It is obvious from the legislative history that the Congress was aware of the previous provisions of Title 35 U.S.C. (40

Stat. 394, 65th Congress 1st Session, as amended by 54 Stat. 710, 76th Congress, 3d Session 1940) which restricted the bringing of such suits to the Court of Claims, and that Congress desired to change this limitation. Cf. 97th Cong. Rec. 13670, 82d Congress, 1st Session 1951; see also 72 Harv.L.Rev. 781.

2. In the determination of a reasonable royalty rate for the computation of a fair award of damages, such factors as the limited marketability of the product (thus requiring that the entire compensation be obtained from the Government) must be equated with assumption of risk in providing capital for the production of the invention and other similar variables (which factors would tend to depress the allowable royalty rate). See for example Olsson v. United States, 1938, 87 Ct.Cl. 642, 25 F.Supp. 495; Breese Burners, Inc. v. United States, 1957, 140 Ct.Cl. 9.

of which apparatus fail to operate with any utility absent the invention, damages will be based upon the total costs of the apparatus, including those elements necessary for the efficient operation of the machine but extraneous to the patented portions of the article. Cf. Marconi Wireless Telegraph Company of America v. United States, 1942, 99 Ct.Cl. 1, affirmed in part and reversed in part, 1943, 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed. 1731; Shearer v. United States, 1944, 101 Ct.Cl. 196; Imperial Machine & Foundry Corp. v. United States, 1930, 69 Ct.Cl. 667.[3] However, if the invention may be limited to a separable unit in the device and the other component parts have utility apart from this invention, then the items upon which compensation will be based will be restricted to those parts includable in the invention itself. Waite v. United States, 1930, 69 Ct.Cl. 153.[4]

■ We find that the invention in suit is part of a physical unit of construction which is separable from the entire apparatus or sights of which it is a part. Compensation for use may not be based, therefore, on the cost of the entire completed devices or machines, which were delivered under contracts entered into by the Government with Eastman Kodak Company for Hemisphere Gunsights,

Periscopic Bombsights and spare parts. Waite v. United States, supra.

Our task here is to apportion the costs of the devices or machines delivered which is attributable to this Claim No. 4 of the patent; this we have found to be, in all the devices or machines delivered, separable from the "sights" of which it is but a part.

The issues to be resolved were stated by the Court during this trial (SM p. 1253) as follows:

"Is the plaintiff entitled to compensation for the employment of its invention from March 2, 1946 to November 1, 1960, and, if so, how much?"

The invention was embodied in what has been designated by the Government as the Y–1 and Y–3 Bombsights, and the B–36, A–3, A3A, MD–9 and TV Optical head assemblies for Gunsights. We have in evidence Defendant's Second Phase Trial Exhibit P (for convenience we have referred to the portion of the trial in which we seek to ascertain damages as the "second phase trial", and marked the plaintiff's exhibits on this portion of the trial as "PXS" and the defendant's exhibits as "DXS"). This summary or schedule prepared and offered by the Government lists the Eastman Kodak

3. In Shearer v. United States, the entire value rule was applied in the building of the retaining walls or levees for flood control because though the prior art knew of the existence of concrete slabs or blocks to shore up the river banks, it was the flexibility and ease of installment brought about by the plaintiffs' invention that enabled inexpensive launching and so made the use of these concrete blocks feasible. 1944, 101 Ct.Cl. 196.

In Marconi Wireless Telegraph Company of America v. United States, the patent, which enabled the operator of the radio to tune selectively and adjust the antenna of any receiving station to any desired transmitting station, was deemed to be of such fundamental importance by the Court of Claims that the Court of Claims allowed compensation upon the entire value of the device. 1942, 99 Ct.Cl. 1, reversed in part

and affirmed in part, 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed. 1731.

In Imperial Machine & Foundry Corp. v. United States, the plaintiff was held to be entitled to compensation based upon the entire value of the machine because by the use of abradant discs, these machines could operate for the first time to peel a deep mass of vegetables, and thus for the first time these machines gained utility for the Government. 1930, 69 Ct.Cl. 667.

4. In Waite v. United States, a suit involving a patent for improvement of an X-ray system for use as a portable field unit, plaintiff was entitled to only that portion of the profits which were attributable to the transformers (the subject of the patent) because all of the other units were capable of performing their ordinary function aside and apart from any given type of transformer. 1930, 69 Ct.Cl. 153.

Company Purchase Order or Contract for each type or model of Bombsights or Gunsights ordered, the quantity of each type and the amount paid by the Government.

It appears that our primary study of the evidence should be directed to ascertaining what portion of the complete sights delivered represent actual embodiment of the Tripp invention and the reasonable compensation thereon.

In weighing the factors to determine reasonable compensation, we are mindful of the applicability to the instant suit of comments by the Court of Claims in Olsson v. United States, supra, 25 F.Supp. at page 500.

"Plaintiff was not in a position to manufacture and sell, or have manufactured and sold, to the United States complete guns embodying his invention which would be acceptable to the United States. Through the use by the United States of plaintiff's invention on the guns which it designed and manufactured or acquired at its own expense, plaintiff was relieved of the trouble, expense, and responsibility of manufacture and sale. In these circumstances it seems clear that plaintiff's reasonable and entire compensation paid contemporaneously with the appropriation of the use of his invention was only a percentage of the monetary value of the advantages accruing to the United States by reason of such use. The United States was entitled to claim the benefit of a large portion of the value of the savings in cost and other advantages by reason of its assumption of the care, trouble, risk, expense, and responsibility attending the incorporation of the invention in suit into an acceptable design and the manufacture of the guns."

During the course of the trial, the term "invention area" was coined to designate the separable unit of construction of the entire manufactured and assembled article which embodied and employed the Tripp invention. It is this "invention area" upon which plaintiff's

compensation must be based. It must be defined if we are to consider the contract costs to the Government of the Eastman Kodak Company delivered article, in fixing plaintiff's just compensation.

Some of the Gunsights and Bombsights employed camera or television attachments. There is no problem as to these camera or television attachments, concededly they form no part of the invention area. Cf. Waite v. United States, supra.

All of the Gunsights and Bombsights in question, except the television model Hemisphere Gunsight Model AN/ASG15, have an eye piece.

Patent Claim 4 reads as follows:

"4. In a telescope having

"(1) an objective,

"(2) an aperture stop, and

"(3) axially separated prismatic scanning elements mounted in front of the objective,

"(4) said scanning elements having their prismatic axes mutually perpendicular and having the prismatic axis of the element closer to the objective disposed perpendicular to the optical axis of the telescope,

"(a) a cylindrical lens interposed between the objective and aperture stop adjacent a plane at which the telescope focuses images of distant objects for astigmatizing the image of the aperture stop produced by the elements of the telescope between the aperture stop and scanning elements,

"(b) said cylindrical lens having its cylindrical axis disposed perpendicular to the axis of the telescope and parallel to the prismatic axis of the element closer to the objective."

Section 183—Right to Compensation—Title 35, United States Code, provides as follows:

"An applicant, his successors, assigns, or legal representatives, whose patent is withheld as herein provided, shall have the right, beginning at the date the applicant is notified that, except for such order, his application is otherwise in condition for

allowance, or February 1, 1952, whichever is later, and ending six years after a patent is issued thereon, to apply to the head of any department or agency who caused the order to be issued for compensation for the damage caused by the order of secrecy and/or for the use of the invention by the Government, resulting from his disclosure. The right to compensation for use shall begin on the date of the first use of the invention by the Government. The head of the department or agency is authorized, upon the presentation of a claim, to enter into an agreement with the applicant, his successors, assigns, or legal representatives, in full settlement for the damage and/or use. This settlement agreement shall be conclusive for all purposes notwithstanding any other provision of law to the contrary. If full settlement of the claim cannot be effected, the head of the department or agency may award and pay to such applicant, his successors, assigns, or legal representatives, a sum not exceeding 75 per centum of the sum which the head of the department or agency considers just compensation for the damage and/or use. A claimant may bring suit against the United States in the Court of Claims or in the District Court of the United States for the district in which such claimant is a resident for an amount which when added to the award shall constitute just compensation for the damage and/or use of the invention by the Government. The owner of any patent issued upon an application that was subject to a secrecy order issued pursuant to section 181 of this title, who did not apply for compensation as above provided, shall have the right, after the date of the issuance of such patent, to bring suit in the Court of Claims for just compensation for the damage caused by reason of the order of secrecy and/or use by the Govern-

ment of the invention resulting from his disclosure. The right to compensation for use shall begin on the date of the first use of the invention by the Government. In a suit under the provisions of this section, the United States may avail itself of all defenses it may plead in an action under section 1498 of title 28. This section shall not confer a right of action on anyone or his successors, assigns, or legal representatives who, while in the fulltime employment or service of the United States, discovered, invented, or developed the invention on which the claim is based. July 19, 1952, c. 950, § 1, 66 Stat. 806."

The inventor Tripp, testifying as an expert for the plaintiff, applied the statement of elements of Claim 4 of the patent to articles manufactured for the Government by Eastman Kodak Company. He compared the Government Manual PX–21, representing the optical system of the Hemisphere Gunsight, with the manufactured articles of this type (TR–1454). He stated that, in his opinion,

"The Invention area in terms of the optics would start at Item 1, the spherical dome and include all of the obstacle elements on the main optical axis through to and including the eye lens, but with the exception of Item 11, the clear filter." (TR–1456)

He enumerated the items of the structure which he found in the invention area as consisting of a telescope containing an objective lens, a reticle lens assembly, a first and second erector, an erecting prism, a Schmidt Roof prism, a Hollow Field correction lens and an eye piece lens. He had included in this grouping the perpendicular and azimuth prisms and the cylindrical lens (the latter as part of the reticle lens assembly).

The inventor Tripp also compared the Government Manual PX–34 representing the optical system of the vertical periscopic bombsight, with the manufactured articles of this type (TR–1457). As to this article, he testified the invention area consisted of the telescope, including

the objective lens system; reticle and correction plate assembly; lower erector cell assembly; derotating prism; upper erector cell assembly; deflecting prism; correction plate and eyepiece (TR–1459). In sum, this witness Tripp included in the invention area all of the optical elements in the schematic optical system illustrated in PX–34 "on the main optical axis, starting with the glass dome, Item 1, and ending with the eyepiece, item 19."

The witness Tripp prepared, and there was received in evidence, PXS–39, as a statement of the elements comprising the separable unit of the several manufactured articles which employed the invention.

It was following this that Government attorneys stated that objection was taken, generally, to the inclusion of anything rearward of the erectors (TR–1459). The Government later stated its position as follows:

"The defendant concedes that the prism assembly, the mechanism for rotating the prisms, excluding the electric motors and electric wiring in connection therewith, the objective, the cylindrical lens and erector forming part of the front telescope will be included." (TR–1462)

In fixing the apportioned cost of the invention area, the plaintiff has listed and added in some of the prices set by Eastman Kodak Company for the individual parts and the separate assemblies of parts not on the basis of actual costs of production or as parts of a complete device or sight. It appears (TR–1728) that so priced as spare parts the separate parts are higher as they include a charge varying from 6 to 16%

for extra packaging and for storage. However, a problem most difficult of proof was presented to plaintiff; more definite and reliable information lay with the Government and with Eastman Kodak Company. Plaintiff in reaching its evaluation of the cost of the separable "invention area" used also some of its own costs; the Government relied upon the cost figures prepared by Eastman Kodak Company (PXS–67 and 68). It is, however, significant to note that the Government did not place in evidence the actual costs of items not considered by the Government to be within the "invention area". Such proof might have served to complete the partial picture presented; its absence from the record is a matter which must be weighed when reaching a finding of the costs of the invention area.

However, "The law will make the best appraisal that it can, summoning to its service whatever aids it can command." Sinclair Refining v. Jenkins, 289 U.S. 689, 697, 53 S.Ct. 736, 739, 77 L.Ed. 1449.[5] We make our own appraisal for neither the plaintiff nor the Government has completely convinced us. Cf. Bowdowski v. United States, Ct.Cl., 278 F.2d 934, 936. For it is clear, as plaintiff's witness Buchholtz testified:

"This method of selecting certain costs is conducive to errors of omission which cannot be detected until all item costs are added and are at least equal approximately to the total cost." (TR 1936–1937)

Following through on this testimony, the witness continued:

" * * *: that costs are not set up primarily to determine percentages of area of invention, so that

5. The Supreme Court in Sinclair Refining v. Jenkins approved the method of determining a fair compensation by the use of expert witnesses on the state of the art, character of the improvement and probable increase in the efficiency, and the savings of expense. 289 U.S. 689, 53 S.Ct. 736.

The Court of Claims, in a suit in which the entire value of the apparatus was attributable to the invention, commented

that it utilized the available figures of the plaintiff over the objections of the defendant in the absence of proof by the defendant (United States) in regard to the lost sales and profits. It is noteworthy that the defendant therein had audited the books of the plaintiff prior to the trial and thus had the figures available. Imperial Machine & Foundry v. United States, supra.

when you do not have all the facts and cannot add them to 100%, you do not know how right or how wrong you are."

So, too, we must appreciate that the accounting charges for general and administrative expenses and for profit are included in the price of the spare parts list, as well as the packaging costs. Plaintiff's accountant would set 10% as fair for packaging, 10% for profit and 12% for general and administrative expenses; these total 32%.

We finally had in evidence plaintiff's exhibit S-81 which is a summary statement of plaintiff's claim for fair compensation for use which it computed at a 5% rate of compensation figured on its calculation of the cost of the invention area to the Government for the sights procured.

Basically, the Government would confine the invention area to but four elements of the invention, to wit:

1. The scanning prisms (double dove) and mounts

2. The mechanism for mounting the prisms for rotation

3. The objective including the mount

4. The astigmatizer (the cylindrical field lens)

To these elements, it would add only "the parts of the support for maintaining these four elements in alignment and for providing an aperture stop for the objective" (Exhibit DXS–H; testimony of Holmes of Eastman Kodak Company (TR 1749 et seq.).) Specifically, this position would exclude "any color filters, the relay lens, the eyepiece, the camera or any electrical controls other than those constituting the prism moving means."

We rejected as clearly out of the invention area the "camera" and, in the type employing television, that device.

We must take as a guide in determining this "invention area" the Government Manual PX–21, particularly Figures 1–2, page 2, which present the "Main Optical System Diagram" of the

Hemisphere Gunsight, and Government Manual PX–34, particularly Figures 1–4, page 6, which present the "Optical System Schematic" of the Vertical Periscopic Bombsight.

Trial, as we have noted, developed conflict with respect to whether a number of items should be included in the "invention area"; we shall consider them. These items included:

1. *The dome*—which is one of the main protective windows or seals for the optical system of the entire device. This protective window covers the portion of the hemisphere sight and of the gunsight, which project beyond the skin of the plane in which it is installed. The prisms were considered to be an integral part of the invention area (TR–1498) and the dome served to permit these to operate, even if it served no other purpose.

We find that none of these hemispheric sights could effectively operate without protrusion of the prisms beyond the wall of the planes; and that a protractive dome, sealing or covering, was necessary and essential to employment of the invention.

2. *The eye piece*—exactly how one could use a telescope or periscope for human sighting without some form of eyepiece is difficult to understand. The optical system forms an image of what is being sighted which must be viewed through an eye piece. We have noted that of all the gunsights and bombsights only the television model Hemisphere Gunsight Model An–ASG15 (PXS–19) has no eye piece. When Holmes, the optical expert of Eastman Kodak Company called by the Government, was asked whether the invention could be put to any practical use and operation without an eyepiece, he replied, "or the equivalent, no, sir." The eyepiece is found to be within the invention area.

3. *The rearward half portion of the erectors*—the Government seemed at first to contend that there should not be included in the invention area "anything

rearward of the erectors" (TR 1459). This position was later modified to include "the erector forming the front telescope" (TR 1462). The particular portions in dispute may best be noted on PX–18, the hemispheric gunsight type A–3A, by reference to page 11 of Section 1 of that exhibit, showing a "Main Optics Diagram". This diagram shows two erector systems—"the first erector system consisting of Items 9 and 10, and the second erector system consisting of Items 16 through 21" (TR 1470). The function of the first erector was described by Tripp, and we feel accurately, as follows:

"The first erector assembly—relays the image from the first focal plane to the second focal plane and, incidently, inverts it." (TR 1495)

The second erector is necessary to invert the image back to an erect image.

We have kept in mind when making our final computations fixing the reasonable compensation for the use of plaintiff's invention that, while this sum cannot be reached with the mathematical accuracy of an accounting, it must not be the result of conjecture or an amount arbitrarily reached without application of practical, commonsense, business experience. We are determining neither an agreed royalty due on the portion of the manufactured items employing the invention, nor an award of damages based on the profits derived from a knowing infringement. We may not reach the amount due plaintiff entirely through a pathway of accounting and arithmetical calculation; indeed, such a procedure would lead us into a maze of irreconcilable figures and bring us to an unrealistic result. This is especially so because here we are not dealing with one standard article of manufacture, but have a number of different models and types of gunsights and bombsights, manufactured and delivered in various quantities over a long period of years, and each with an area of invention which both parties agree varied in each separate model and type. Yet, there are some basic figures in the voluminous records before us which must serve us as measures and guides.

We must ascertain and evaluate:

1. The total amount paid by the Government to Eastman Kodak for the complete gunsights and bombsights.

2. The amount paid to Eastman Kodak for spare parts for use in the separable unit embodying the invention.

3. The dollars and cents amount of the total payments made to the Eastman Kodak Company attributable to cost of the separable unit embodying the invention.

4. The percentage proportion which the separable invention unit bears to the entire gunsight and bombsight.

5. The fair compensation due plaintiff on these amounts, together with a sum which will also compensate plaintiff for the delay in payment.

The Government concedes that through November 1, 1960, it purchased a total of 1646 sights employing the Tripp invention from the Eastman Kodak Company for which it paid a total of $41,126,461 (which is in excess of the figure of $40,657,450.31 submitted by plaintiff); and of that total 956 of these sights costing $30,315,925 were so purchased through the year 1955. The distribution of these sights by model is stated by the Government through 1955 as follows:

| | | | |
|---|---|---|---|
| Y-models ..... | 550 sights, | costing .... | $16,417,349 |
| B-36 models ... | 22 " | " .... | 1,535,381 |
| | 304 " | " .... | 8,745,469 |
| A-3 and A-3A models .. | 80 " | " .... | 3,617,726 |
| | | | $30,315,925 |

The Government has also submitted a breakdown of these figures for the years through November 1, 1960:

| | | | |
|---|---|---|---|
| Y-models ..... | 550 | sights, costing ... | $16,417,349 |
| B-36 models ... | 22 | " " ... | 1,535,381 |
| | 304 | " " ... | 8,745,469 |
| A-3, A-3A, | | | |
| MD-9 models .. | 486 | " " ... | 10,231,179 |
| TV. OPT. HD. . | 284 | " " ... | 4,197,083 |
| | 1646 | | $41,126,461 |

In computing the portion of the invention attributable to the devices in suit, the Government has submitted as the proper criteria the following percentages:

Through Year 1955

| | | | | | |
|---|---|---|---|---|---|
| Y-3 | model | ...34.2%, | yielding | ... | $5,614,733.36 |
| B-45 | " | ...29.2 | " | ... | 448,331.25 |
| B-36 | " | ...29.2 | " | ... | 2,553,676.95 |
| A-3 & A-3A | " | ...28.2 | " | ... | 1,020,198.73 |
| | | | | | $9,636,940.29 |

Through November 1, 1960, additional

| | | | | | |
|---|---|---|---|---|---|
| Y-3 | model | ...34.2%, | yielding | ... | $ 5,614,733.36 |
| B-45 | " | ...29.2 | " | ... | 448,331.25 |
| B-36 | " | ...29.2 | " | ... | 2,553,676.95 |
| A-3, A-3A, MD9 | " | ...28.2 | " | ... | 2,885,192.48 |
| TV Opt. HD | " | ...28.8 | " | ... | 1,208,759.90 |
| | | | | | $12,710,693.94 |

It is upon these respective amounts that the Government would have us base compensation (in the event that plaintiff is entitled to any recovery in this suit), at the rate of 3% upon the first $8,000,000 of sales and 2% on the remainder thereof. This would yield, according to the Government's computation, a total of $272,738.81 through 1955 and a total of $334,212.88 through November 1, 1960. It must be noted, however, that these computations entirely omit the expenditure of $5,502,482.35 for spare parts and there is no item of compensation in lieu of interest for delay in payment for use of the invention.

The sights designated by the Government as "Y-models" are classified by the plaintiff as "Periscopic Bombsights Y–1 and Y–3". We find these bombsights were delivered by Eastman Kodak in the years indicated in the following sums:

Periscopic Bombsights Y-1 and Y-3

| | | |
|---|---|---|
| 1950 | – | $ 1,729,306.00 |
| 1951 | – | 5,093,796.01 |
| 1952 | – | 4,654,085.00 |
| 1953 | – | 3,250,082.00 |
| 1954 | – | 1,690,080.00 |
| Total Periscopic Bombsights | – | $16,417,349.01 |

The sights designated by the Government as "B–36" models are classified by the plaintiff as "Hemispheric Gunsights —2CSH4A3, and 2CSH6E1, and AA–1". We find these sights were delivered by Eastman Kodak as follows:

Hemispheric Gunsights

| | | | |
|---|---|---|---|
| 2CSH4A3 | 1950 | – | $ 127,866.00 |
| | 1951 | – | 1,194,956.00 |
| | | | $1,322,822.00 |
| | | | |
| 2CSH6E1 | 1950 | – | $ 779,023.00 |
| | 1951 | – | 2,640,241.52 |
| | 1952 | – | 2,646,962.02 |
| | 1953 | – | 1,356,420.46 |
| | | | $7,422,647.00 |
| | | | |
| AA-1 | 1950 | – | $1,320,584.48 |
| | 1951 | – | 214,796.72 |
| | | | $1,535,381.20 |

The same classification has been used by both plaintiff and the Government for "Hemispheric Gunsights—Models A–3 and A–3–A, and MD–9." We find these gunsights were delivered by Eastman Kodak as follows:

Hemispheric Gunsights A-3, A-3-A, MD-9

| | | |
|---|---|---|
| 1952 | – | $ 426,039.50 |
| 1953 | – | 971,620.00 |
| 1954 | – | 936,274.00 |
| 1955 | – | 1,283,792.00 |
| 1956 | – | 4,926,736.00 |
| 1957 | – | 1,355,948.10 |
| 1958 | – | 253,003.90 |
| 1959 | – | 77,764.60 |
| | | $10,231,178.10 |

We have thus far found the total expenditure for all sights employing the invention save only "Hemispheric Gunsight ASG–15(T.V.)". We have also noted the total amount of expenditures for all types of sights stated by the Government's figure of $41,126,461 and the plaintiff's figure of $40,657,450.31, reflecting a difference of $469,010.69. This entire difference is found in the statement of expenditure for this T. V. gunsight—here the Government's figure is $4,197,083.69 and the plaintiff's figure is $3,728,073. We accept the plaintiff's figure and find the expenditures for Herispheric Gunsight ASG-15 (T.V.) as follows:

Hemispheric Gunsight ASG-15 (T.V.)

| | | |
|---|---|---|
| 1957 | – | $ 41,526.00 |
| 1958 | – | 928,324.30 |
| 1959 | – | 2,377,930.70 |
| 1960 | – | 380,292.00 |
| | | $3,728,073.00 |

In summary, we find the expenditures for all sights through November 1, 1960, as follows:

Hemispheric Gunsights

| | | |
|---|---|---|
| 2SCH4A3 | $ 1,322,822.00 | |
| 2SCH6E1 | 7,422,647.00 | |
| AA-1 | 1,535,381.20 | |
| A-3, A-3-A, MD-9 | 10,231,178.10 | |
| ASG-15 (T.V.) | 3,728,073.00 | |
| Total Hemispheric Gunsights — | | $24,240,101.30 |

Periscopic Bombsights

| | | |
|---|---|---|
| Y-1 and Y-3 | — | 16,417,349.01 |
| Total All Sights | | $40,657,450.31 |

————◆————

We look now for our next guide and approach the ascertainment of the amount expended for spare parts for each of the sights in suit. There is no dispute as to the total amount or distributive amount expended for each type sight. We find these expenditures for spare parts to have been made as follows:

| Type of Sight | Years of Delivery | | |
|---|---|---|---|
| Hemisphere Gunsights | | | |
| 2CSH4A3 | 1951 — | $ 18,504.40 | |
| | 1952 — | 156,913.94 | |
| | 1953 — | 57,110.64 | |
| | | $ 232,528.98 | |
| 2CSH6E1 | 1951 — | $ 18,941.26 | |
| | 1952 — | 274,607.45 | |
| | 1953 — | 550,963.00 | |
| | 1954 — | 357,955.25 | |
| | 1955 — | 1,590.78 | |
| | | $1,204,057.74 | |
| A-3, MD-9 | 1953 — | $ 7,586.00 | |
| | 1954 — | 5,182.61 | |
| | 1955 — | 206,052.35 | |
| | 1956 — | 225,941.81 | |
| | 1957 — | 305,028.15 | |
| | 1958 — | 35,095.26 | |
| | | $ 784,886.18 | |
| ASG-15 | 1958 — | $ 116,836.87 | |
| | 1959 — | 404,549.29 | |
| | 1960 — | 111,133.18 | |
| | | $ 632,519.34 | |
| Total Hemispheric Gunsights — | | | $2,853,992.24 |

Periscopic Bombsights

| Y-3 | | | | | |
|---|---|---|---|---|---|
| | 1951 | – | $ | 32,389.60 | |
| | 1952 | – | | 183,423.34 | |
| | 1953 | – | | 713,895.07 | |
| | 1954 | – | | 932,347.01 | |
| | 1955 | – | | 758,599.29 | |
| | 1956 | – | | 2,199.00 | |
| | 1957 | – | | 25,636.80 | |

Total Periscopic Bombsights –                    $2,648,490.11.

Grand Total                    –                    $5,502,482.35

———◆———

The procedure followed by the parties to the suit in determining the amount paid by the Government for the separable unit which embodied the invention was first to define this unit (or invention area) in terms of the parts of the entire sight; then, having listed these parts found to be within the invention area, to price those parts; and then to express the total cost of those parts in terms of a percentage of the total cost of the complete sight.

This pricing was done by the defendant after a listing of these parts taken from a representative lot of contracts for the various models "on the basis of actual factory costs (excluding profits and administrative overhead) at the time of manufacture of the representative lot of sights." It was by this procedure that the defendant early in the trial first fixed the actual cost of the invention area on the representative B–36 contract as 15.3% of the total cost of the complete sight; and 20.8% of the total cost of the representative Y–3 contract. Later in the trial, the Government changed its calculations which had excluded the front half of the erector and the azimuth drive assembly and included these parts (save for the electrical parts of the azimuth drive assembly) in the area of invention. By these adjustments, and also by adding a part of the estimated overall assembly, the Government stated the percentage of total cost of the completed sights for each model to be:

| Model Y-3 | – | 34.2% |
|---|---|---|
| B-45, B-36 | – | 29.2% |
| A-3, A3A, MD-9 | – | 28.2% |
| TV Opt.Hd Assbly | – | 28.8% |

These revised calculations of the Government have omitted from the invention area, and do not include the cost of the second half of the erector, the eye piece assembly and the dome assembly. These three items we have found to be within the invention area and the Government's percentage of total cost applicable to the invention area must be increased. These calculations omit all reference to spare parts for the invention area.

But, we find we cannot accept plaintiff's figures as to the percentage of total cost applicable to the invention area.

The plaintiff's final calculations made during trial would apportion the following percentages to the invention area of the several models:

| Sights | Percentage of Area |
| Hemispheric Gunsights | of Invention |
| --- | --- |
| 2CSH4A3 | 75.44% |
| 2CSH6E1 | 79.78% |
| AA-1 | 79.78% |
| A-3, A-3-A, MD-9 | 74.47% |
| ASG-15 (T.V.) | 70.13% |
| Periscopic Bombsights | |
| Y-1 and Y-3 | 72.28% |
| Spare Parts | |
| Hemispheric Gunsights | |
| 2CSH4A3 | 75.44% |
| 2CSH6E1 | 79.78% |
| A-3, MD-9 | 74.47% |
| ASG-15 (T.V.) | 70.13% |
| Periscopic Bombsights | |
| Y-3 | 72.28% |

———◆———

It was shown by Defendant's Exhibit SA that Farrand, the president of the plaintiff, as early as May 14, 1952 and for purposes of negotiation with the Air Force, had instructed his assistants to establish the proportion of the Hemisphere Sight (B–36) and Bombsight (Y–3) which embodied the invention. At that time, Farrand had defined the invention area to include "all assemblies and parts from the two erectors up to and including the dome, but not including motors and synchros." The analysis resulted in Plaintiff's Exhibit S–20; it states an invention area of 38%, and a non-invention area of 62%.

We do recognize the difficulty presented to plaintiff in its attempts to fix the cost of the invention area in a precise and exact amount, or to express this cost in terms of a percentage of the cost of the complete sight. The best we can hope for is a computation which will serve as a guide.

A valid objection to entire acceptance of plaintiff's computations is that plaintiff proceeded to price the parts included in the invention area on the basis of spare parts cost. Some of these parts were selected from contracts not in suit and some were "similar" parts. These spare part costs are higher than actual costs for parts in the completed sight; they include extra charges for special handling, packing, storage, etc. While plaintiff has allowed 12% for administration overhead expenses on the costs of these parts, we would say that the extra cost for parts runs nearer to the total 32% estimate of the plaintiff. Then, too, the prices for spare parts varied with quantity procured; and a comparison of Eastman Kodak's actual costs and plaintiff's spare parts prices discloses no consistent relationship whatsoever.

We note, also, that the calculations of the percentage of total cost applicable to the invention area, proceeding as they did on the basis of a "parts" appraisal and "parts" cost, fail to disclose how much in excess of actual cost an entire sight would be if it were priced by this method! We do agree with the plaintiff's expert that "it is unsound to pick out certain items and say that they are a total cost without accounting for the rest of them"; but it appears that this vice is inherent to some degree in all the computations which have been submitted.

So, too, the efforts of plaintiff's witness (Tripp) to obtain what he designated "a common sight", while helpful in revealing guides for admeasuring fair compensation, could not be accepted if we were to view the problem of fixation of compensation as strictly one for the application of the standards of an accounting. We have indicated that we do not approach the problem by this route.

We find that it will be just and equitable to apply, as a broad guide to fair compensation, a figure of percentage of the total cost applicable to the area of invention which reduced plaintiff's calculations by 40%. We find and state this percentage applicable to the invention area of each sight to be as follows:

| Sights | Percentage of Area |
| Hemisphere Gunsights | of Invention |
| --- | --- |
| 2CSH4A3 | 45% |
| 2CSH6E1 | 48% |
| AA-1 | 48% |
| A-3, A-3-A, MD-9 | 45% |
| ASG-15 (TV) | 42% |
| Periscopic Bombsights | |
| Y-1 and Y-3 | 43% |
| Spare Parts | |
| Hemisphere Gunsights | |
| 2CSH4A3 | 42% |
| 2CSH6E1 | 48% |
| A-3, MD-9 | 45% |
| ASG-15 (TV) | 42% |
| Periscopic Bombsights | |
| Y-3 | 43% |

(Note: We have in these computations disregarded decimal percentages, but have taken the next highest percentum if the result is greater than .5%.)

By applying these percentages to the total expenditures for sights and parts, we find and state the amount expended for the separable unit embodying the invention to be as follows:

| | Years of Delivery | Eastman Kodak Company Sales Value | % Area of Invention | Dollar Value of Area of Invention |
|---|---|---|---|---|
| **Hemispheric Gunsights** | | | | |
| 2CSH4A3 | 1950 | $ 127,866.00 | 45% | $ 57,539.70 |
| | 1951 | 1,194,956.00 | | 537,730.20 |
| | | 1,322,822.00 | | 595,269.90 |
| 2CSH6E1 | 1950 | $ 779,023.00 | 48% | $ 373,931.04 |
| | 1951 | 2,640,241.52 | | 1,267,315.93 |
| | 1952 | 2,646,962.02 | | 1,270,541.77 |
| | 1953 | 1,356,420.46 | | 651,081.82 |
| | | $ 7,422,647.00 | | $ 3,562,870.56 |
| AA-1 | 1950 | $ 1,320,584.48 | 48% | $ 633,880.55 |
| | 1951 | 214,796.72 | | 103,102.43 |
| | | $ 1,535,381.20 | | $ 736,982.98 |
| A-3, A-3-A⌈ MD-9 ⌊ | 1952 | $ 426,039.50 | 45% | $ 191,717.77 |
| | 1953 | 971.620.00 | | 437,229.00 |
| | 1954 | 936,274.00 | | 421,323.30 |
| | 1955 | 1,283,792.00 | | 577,706.40 |
| | 1956 | 4,926,736.00 | | 2,217,031.20 |
| | 1957 | 1,355,948.10 | | 610,176.65 |
| | 1958 | 253,003.90 | | 113,851.76 |
| | 1959 | 77,764.60 | | 34,994.07 |
| | | $10,231,178.10 | | $ 4,604,030.15 |
| ASG-15 (TV) | 1957 | $ 41,526.00 | 42% | $ 17,440.92 |
| | 1958 | 928,324.30 | | 389,896.21 |
| | 1959 | 2,377,930.70 | | 998,730.89 |
| | 1960 | 380,292.00 | | 159,722.64 |
| | | $ 3,728,073.00 | | $ 1,565,790.66 |
| **Total Hemispheric Gunsights** | | $24,240,101.30 | | $11,064,944.25 |
| **Periscopic Bombsights** | | | | |
| Y-1 & Y-3 | 1950 | $ 1,729,306.00 | 43% | $ 743,601.58 |
| | 1951 | 5,093,796.01 | | 2,190,332.28 |
| | 1952 | 4,654,085.00 | | 2,001,256.55 |
| | 1953 | 3,250,082.00 | | 1,397,535.26 |
| | 1954 | 1,690,080.00 | | 726,734.40 |
| **Total Periscopic Bombsights** | | $16,417,349.01 | | $ 7,059,460.07 |
| Total Sights | | $40,657,450.31 | | $18,124,404.32 |

| Spare Parts | Years of Delivery | Eastman Kodak Company Sales Value | % Area of Invention | Dollar Invention Portion of Sales Value |
|---|---|---|---|---|
| Hemispheric Gunsights | | | | |
| 2CSH4A3 | 1951 | $ 18,504.40 | 42% | $ 7,771.85 |
| | 1952 | 156,913.94 | | 65,903.85 |
| | 1953 | 57,110.64 | | 23,986.47 |
| | | $ 232,528.98 | | $ 97,662.17 |
| 2CSH6E1 | 1951 | $ 18,941.26 | 48% | $ 9,091.80 |
| | 1952 | 274,607.45 | | 131,811.58 |
| | 1953 | 550,963.00 | | 264,462.24 |
| | 1954 | 357,955.25 | | 171,818.52 |
| | 1955 | 1,590.78 | | 763.57 |
| | | $ 1,204,057.74 | | $ 577,947.71 |
| A-3, MD-9 | 1953 | $ 7,586.00 | 45% | $ 3,413.70 |
| | 1954 | 5,182.61 | | 2,332.17 |
| | 1955 | 206,052.35 | | 92,723.56 |
| | 1956 | 225,941.81 | | 101,673.81 |
| | 1957 | 305,028.15 | | 137,262.67 |
| | 1958 | 35,095.26 | | 15,792.87 |
| | | $ 784,886.18 | | $ 353,198.78 |
| ASG-15 | 1958 | $ 116,836.87 | 42% | $ 49,071.49 |
| | 1959 | 404,549.29 | | 169,910.70 |
| | 1960 | 111,133.18 | | 46,675.94 |
| | | $ 632,519.34 | | $ 265,658.13 |
| Total Hemispheric Gunsights | | $ 2,853,992.24 | | $ 1,294,466.79 |
| Periscopic Bombsights | | | | |
| Y-3 | 1951 | $ 32,389.60 | 43% | $ 13,927.53 |
| | 1952 | 183,423.34 | | 78,872.04 |
| | 1953 | 713,895.07 | | 306,974.88 |
| | 1954 | 932,347.01 | | 400,909.21 |
| | 1955 | 758,599.29 | | 326,197.69 |
| | 1956 | 2,199.00 | | 945.57 |
| | 1957 | 25,636.80 | | 11,023.82 |
| Total Periscopic Bombsights | | $ 2,648,490.11 | | $ 1,138,850.74 |
| Total Spare Parts | | $ 5,502,482.35 | | $ 2,433,317.53 |
| Grand Total | | $46,159,932.66 | | $20,557,721.85 |

With these amounts of $18,124,404.32 established as the total expended by the Government for the separable "invention area" of the complete sights and $2,433,-317.53 as the total expended for spare parts of the "invention area", we come

to consider the reasonable rate of compensation to be applied.

The Government (assuming plaintiff is to be awarded compensation) contends that a reasonable rate would be 3% on the first eight million dollars on the portion of the total sales prices of the "invention area"; 2% of the next eight million dollars and 1% of all additional amounts.

A witness, produced by the plaintiff, testified concerning a reasonable rate of compensation that:

"I feel that a minimum compensation of the order of 5% royalty is justified and that because of the importance of the invention to the existing Strategic Air Command activities and because of its acknowledged position in the field, that is to say, there is no question of infringement, there is no question as to invention, there is no question as to prior art, and so on, I think in view of that situation, which is quite unusual, and again, as I say the importance of the invention to the Government a royalty of 10 per cent might well be justified." (Tr. 1546–47)

It is the plaintiff's contention that a straight 5% royalty is the reasonable rate.

■ We find that a graduated and scaled royalty should be used in computing the reasonable compensation. Absent a contractual undertaking, we find no standard or set rate; in each case the value and worth of the invention has to be separately evaluated. We have done this and have concluded that a reasonable royalty would be 5% on the first million dollars of purchases; 4% on the next two million dollars of purchases; 3% on the next seven million dollars of purchases; and 2% on all the sums in excess of ten million dollars.

Applying this schedule to the total unit and spare parts purchases we compute:

Amount Expended for "Invention Area"

| | | |
|---|---|---|
| on Complete Sights | – | $18,124,404.32 |
| for Spare Parts | – | 2,433,317.53 |
| Total – | | $20,557,721.85 |

Royalty Computed at:

| | | | | | |
|---|---|---|---|---|---|
| 5% | for | $1,000,000.00 | – | $ | 50,000.00 |
| 4% | for | $2,000,000.00 | – | | 80,000.00 |
| 3% | for | $7,000,000.00 | – | | 210,000.00 |
| 2% | for | 10,557,721.85 | – | | 211,154.44 |
| | | $20,557,721.85 | – | | $551,154.44 |

■ To this sum, we must add an amount which will compensate plaintiff for delay in the making of an award for use. We do not have figures before us which show the monthly amount of purchases; the statements in evidence are of total annual purchases. When seeking further guides in calculating the amount due plaintiff, we have found it just to add "not as interest but as part of the entire just compensation" (Marconi v. United States, 99 Ct.Cl. 1, 61) an additional sum computed at 2½% from the beginning of the calendar year following the year of the stated annual purchases as listed in the schedules submitted and running to July 1, 1961. Again we observe that, although these findings and conclusions will not be filed until August, 1961, we are not charged with a financial accounting, and the time we have set will result in establishing a proper guide to lead us to fixation of an equitable compensation. By this method, we make the following calculations:

| Year of Purchase | Type of Sight | Amount of Invention Area | Total |
|---|---|---|---|
| For | Sights | Only | |
| 1950 | 2CSH4A3 | $   57,539.70 | |
| | 2CSH6E1 | 373,931.04 | |
| | AA-1 | 633,880.55 | |
| | Y-1, Y-3 | 743,601.58 | $  1,808,952.87 |
| 1951 | 2CSH4A3 | 537,730.20 | |
| | 2CSH6E1 | 1,267,315.93 | |
| | AA-1 | 103,102.43 | |
| | Y-1, Y-3 | 2,190,332.28 | 4,098,480.84 |
| 1952 | 2CSH6E1 | 1,270,541.77 | |
| | A-3, A-3-A,  MD9 | 191,717.77 | |
| | Y-1, Y-3 | 2,001,256.55 | 3,463,516.09 |
| 1953 | 2CSH6E1 | 651,081.82 | |
| | A3, A3A, MD9 | 437,229.00 | |
| | Y-1, Y-3 | 1,397,535.26 | 2,485,846.08 |
| 1954 | A3, A3A, MD9 | 421,323.30 | |
| | Y-1, Y-3 | 726,734.40 | 1,148,057.70 |
| 1955 | A3, A3A, MD9 | 577,706.40 | 577,706.40 |
| 1956 | A3, A3A, MD(9 | 2,217,031.20 | 2,217,031.20 |
| 1957 | A3, A3A, MD 9 | 610,176.65 | |
| | ASG-15 (TV) | 17,440.92 | 627,617.57 |
| 1958 | A3, A3A, MD9 | 113,851.76 | |
| | ASG-15 (TV) | 389,896.21 | 503,747.97 |
| 1959 | A3, A3A, MD9 | 34,994.07 | |
| | ASG-15 (TV) | 998,730.89 | 1,033,724.96 |
| 1960 | ASG-15 (TV) | 159,722.64 | 159,722.64 |
| | | Total | $18,124,404.32 |

For Spare Parts Only

| | | | |
|---|---|---:|---:|
| 1951 | 2CSH4A3 | $ 7,771.85 | |
| | 2CSH6E1 | 9,091.80 | |
| | Y-3 | 13,927.53 | $ 30,791.18 |
| 1952 | 2CSH4A3 | 65,903.85 | |
| | 2CSH6E1 | 131,811.58 | |
| | Y-3 | 78,872.04 | 276,587.47 |
| 1953 | 2CSH4A3 | 23,986.47 | |
| | 2CSH6E1 | 264,462.24 | |
| | A3, MD9 | 3,413.70 | |
| | Y-3 | 306,974.88 | 598,837.29 |
| 1954 | 2CSH6E1 | 171,818.52 | |
| | A3, MD9 | 2,332.17 | |
| | Y-3 | 400,909.21 | 575,059.90 |
| 1955 | 2SH6E1 | 763.57 | |
| | A3, MD9 | 92,723.56 | |
| | Y-3 | 326,197.69 | 419,684.82 |
| 1956 | A3, MD9 | 101,673.81 | |
| | Y-3 | 945.57 | 102,619.38 |
| 1957 | A3, MD9 | 137,262.67 | |
| | Y-3 | 11,023.82 | 148,286.49 |
| 1958 | A3, MD9 | 15,792.87 | |
| | ASG-15 | 49,071.49 | 64,864.36 |
| 1959 | ASG-15 | 169,910.70 | 169,910.70 |
| 1960 | ASG-15 | 46,675.94 | 46,675.94 |
| | Total | | $ 2,433,317.53 |

With these yearly total purchases of invention area of sights and spare parts established in dollars and cents, we continue in our computations to state:

## Summary by Years

| | Invention Area Purchases | | | Compensation Computed | Delay in Years | Computed at 2½% to July 1, 1961 |
|---|---|---|---|---|---|---|
| | Sights | Spare Parts | Total | | | |
| 1950 | $ 1,808,952.87 | $ | $ 1,808,952.87 | $ 82,358.11 | 10.5 | $ 21,619.00 |
| 1951 | 4,098,480.84 | 30,791.18 | 4,129,272.02 | 135,788.63 | 9.5 | 32,249.80 |
| 1952 | 3,463,516.09 | 276,587.47 | 3,740,103.56 | 112,203.11 | 8.5 | 23,843.16 |
| 1953 | 2,485,846.08 | 598,837.29 | 3,084,683.37 | 64,910.38 | 7.5 | 12,170.70 |
| 1954 | 1,148,057.70 | 575,059.90 | 1,723,117.60 | 34,462.35 | 6.5 | 5,600.12 |
| 1955 | 577,706.40 | 419,684.82 | 997,391.22 | 19,947.82 | 5.5 | 2,742.83 |
| 1956 | 2,217,031.20 | 102,619.38 | 2,319,650.58 | 46,393.01 | 4.5 | 5,219.21 |
| 1957 | 627,617.57 | 148,286.49 | 775,904.06 | 15,518.08 | 3.5 | 1,357.83 |
| 1958 | 503,747.97 | 64,864.36 | 568,612.33 | 11,372.25 | 2.5 | 710.77 |
| 1959 | 1,033,724.96 | 169,910.70 | 1,203,635.66 | 24,072.71 | 1.5 | 902.73 |
| 1960 | 159,722.64 | 46,675.94 | 206,398.58 | 4,127.97 | .5 | 51.60 |
| Total | 18,124,404.32 | $2,433,317.53 | $20,557,721.85 | $551,154.42 | | $106,467.75 |

By adding the compensation computed at the rate we have found to be reasonable and the amount of award for delay in payment, we find that the just and fair

compensation due plaintiff is $657,622.17. We conclude that judgment should be awarded plaintiff against the defendant in that amount, together with taxable costs and disbursements. The Clerk is directed to enter judgment for the plaintiff in that total sum.